Ruth GOEBEL, Kathy Edmiston, George Wooten, Lee A. Williams, Jr., Laura Munson, and All Other Similarly Situated Persons, and Jessie Arevalo, Lindsey Griffith, Robert Phares, Bill Pemberton, Individually and on Behalf of the Class of Persons herein described, Petitioners,

v.

COLORADO DEPARTMENT OF INSTITUTIONS, Henry Solano, in his official capacity as the Director of the Colorado Department of Institutions; City and County of Denver, Federico Peña, in his official capacity as Chief Executive of the City; Thomas Moe, in his official capacity as the acting Director of the Department of Health and Hospitals; and Edmond Casper, in his official capacity as Director of Psychiatric Services, Department of Health and Hospitals, Respondents.

No. 91SC218.

Supreme Court of Colorado,
En Banc.

June 1, 1992.

Rehearing Denied June 29, 1992.

James W. Dean, Legal Aid Soc. of Metropolitan Denver, Inc., and Kathleen Mullen, Law Offices of Kathleen Mullen, Denver, petitioners.

Rodney R. Patula, Pryor, Carney & Johnson, P.C., Englewood, for Colo. Lawyers Committee.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Stacy L. Worthington, Asst. Atty. Gen., Margery T. Bornstein, Sp. Asst. Atty. Gen., Denver, for State of Colo.

Daniel E. Muse, City Atty., Morris P. Evans, Niels Loechell, R.W. Hibbard III, Asst. City Attys., Denver, for City and County of Denver.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari prior to judgment by the court of appeals pursuant to C.A.R. 50 to consider whether the trial court erred in defining the class of plaintiffs entitled to relief on the claims asserted under the Colorado Act for the Care and Treatment of the Mentally Ill (the Act). *See* §§ 27–10–101 to –129, 11B C.R.S. (1989 & 1991 Supp.). This is only one of several issues raised on appeal after the trial court entered final judgment as to part of the case pursuant to C.R.C.P. 54(b). The trial court concluded that, to be a member of the class, a person must be so mentally ill as to be gravely disabled or a danger to himself or others. It limited the class to those who reside in the northwest Denver catchment area and who had received care in that area before 1984. *Goebel v. Colorado Dep't of Institutions*, No. 81MH270 (Denver P.Ct. December 31, 1990). We affirm in part and reverse in part. We remand the case to the court of appeals to consider the other issues raised on appeal.

## I.

Public mental health services in Colorado are provided by state institutions and numerous community mental health facilities located throughout the state, and are supervised by the Colorado Department of Institutions through its Division of Mental Health. Until 1985, the City and County of Denver was divided into four "catchment areas," with a separate community mental health care facility in each catchment area. The area involved in this litigation is the northwest Denver catchment area which included downtown Denver and Capitol Hill. The community mental health center for that area originally was the Denver Department of Health and Hospitals (DHH), which had contracted with the state to serve in that capacity and received state funds for the delivery of these services.

In 1980 and 1981, due to insufficient funds and the failure of the state legislature to provide increased support, DHH developed a plan to reduce mental health services. Before the planned reductions became effective, the plaintiffs filed two actions in the district and probate courts in 1981 on behalf of themselves and a class of approximately 3,000 to 5,000 low-income, chronically mentally ill persons residing in the northwest Denver catchment area. The actions were filed against various state and municipal defendants,[1] and were based in part on a statutory right to mental health care and treatment created by the Act, *see* § 27–10–116. The two cases were consolidated for hearing before the Denver Probate Court, acting as the district court. The plaintiffs moved for class certification and for a temporary restraining order and preliminary injunction to prevent the reduction of mental health services scheduled to take effect on June 1, 1981.

The case was tried in September 1982, and over two years elapsed without a decision by the trial court. During that time, the mental health services system was reorganized. On December 31, 1984, DHH completed its contract with the state and ceased to be the provider of community mental health services.[2] On January 1, 1985, the Aurora Community Comprehensive Mental Health Center became the new provider of mental health care in the northwest catchment area.

On May 7, 1985, the trial court issued a declaratory judgment, concluding that the Act "creates broad statutory rights for certain identified chronically mentally ill persons to receive comprehensive care and treatment while known to be residing in the Northwest Catchment Area" and that the municipal and state defendants had not fully satisfied this right to care. The court set forth the description of the class as follows:

All persons residing in the Northwest Catchment Area of the City and County of Denver, Colorado, of whom Denver Health and Hospitals/Mental Health Center knows (or reasonably should be aware) who during the pendency of this action: (1) receive mental health services; or (2) whose mental health care aftercare upon discharge from any other mental health facility is the statutory responsibility of Denver Health and Hospitals/Mental Health Center.

This class excludes those chronically mentally ill persons within that catchment area of whose status as chronically mentally ill it would be unreasonable to expect Denver Health and Hospitals/Mental Health Center to be aware in the exercise of its functions, except until such time during the pendency of this action as Denver Health and Hospitals/Mental Health Center is made aware of any such individual residing within its catchment area.

In December 1985, the trial court ordered the defendants to submit a plan for the delivery of appropriate community mental health services. The state developed a remedial plan but, before this plan was implemented, the legislature passed Senate Bill 120 amending several sections of the Act to include the language "subject to available appropriations." Ch. 210, secs. 1–4, §§ 27–10–101, –107, –109, –116, 1986 Colo.Sess. Laws 1010, 1010–11. The trial court concluded that it no longer had jurisdiction to order injunctive relief and dismissed all claims except those for damages incurred in violations of the Act prior to Senate Bill 120. The trial court entered final judgment pursuant to C.R.C.P. 54(b), and the plaintiffs below appealed to the court of

---

**1.** The first action was filed against the Colorado Department of Institutions and the director of that department. The second action was filed against the City and County of Denver, the Mayor, the Director of the Department of Health and Hospitals, the Director of the DHH Mental Health and its director and the Colorado Department of Institutions and its director. For a more detailed description of the case history, *see Goebel v. Colorado Department of Institutions (Goebel I)*, 764 P.2d 785, 788–92 (Colo. 1988).

**2.** However, Denver continued to provide long-term and short-term mental health care under §§ 27–10–105 to –109, 11B C.R.S. (1989).

appeals. We granted certiorari prior to judgment by the court of appeals.

In *Goebel v. Colorado Department of Institutions,* 764 P.2d 785 (Colo.1988) (*Goebel I*), we considered, among other issues, whether the certification of the class was proper under C.R.C.P. 23 and we held that the district court should have delineated more carefully the nature of each claim for relief and the categories of plaintiffs who could ask for such relief. Accordingly, we remanded the case back to the trial court.

In July 1989, the Mental Health Corporation of Denver (MHCD), a private organization, became the new provider of mental health services and consolidated the four geographically based catchment areas into a single administrative unit. MHCD is monitored by the Colorado Department of Institutions in its delivery of public mental health care. Under this system, the state contracts annually with MHCD for the provision of community mental health services. Although the city has been replaced by MHCD as provider of community mental health services, the city continues to provide certain types of short- and long-term health care. *See* footnote 2 above.

On December 31, 1991, the trial court redefined the class for purposes of asserting statutory claims as follows:

> All chronically mentally ill persons who at any time between June 1, 1981 and December 31, 1984 have resided in the Northwest Catchment Area of the City and County of Denver, Colorado, and who received evaluation, care, or treatment within the Northwest Catchment Area under the [Act] (either as a voluntary or involuntary patient) from [DHH] or its successors, or from any other Northwest Catchment Area mental health program funded through the Colorado Department of Institutions.

The trial court, referring to specific language in *Goebel I,* stated:

> The Supreme Court characterized the Act as providing "comprehensively for the commitment, care and treatment of persons who are mentally ill, and as a result of mental illness, a danger to others or to themselves or gravely dis-

abled[.]" *Id.,* at 796. Thus, on November 16, 1989, this Court concluded as a matter of law that mental health system clients whose mental illness renders them dangerous to themselves or others or gravely disabled receive care and treatment "under" the provisions of the Act. This limitation applies regardless of whether the client voluntarily receives services and regardless of whether the client has experienced inpatient hospitalization. Thus, when this Court uses the term "receiving care and treatment under the Act[,]" this qualification is applicable.

This limitation reduces the size of the plaintiff class to less than 600 persons from the 1,600 to 3,000 persons that the plaintiffs argue should be within the class. Final judgment was entered pursuant to C.R.C.P. 54(b) and the plaintiffs appealed the trial court's December 31, 1990 order to the court of appeals. The plaintiffs then filed with this court a petition for writ of certiorari before judgment pursuant to C.A.R. 50. We granted certiorari to review only the trial court's redefinition of the class.

To complete our brief review of the history of this case, we note that part of the case remains pending in the trial court. In that connection, we recently reviewed the trial judge's denial of a July 21, 1991 motion to recuse him filed by the plaintiffs on the ground that the judge was biased or prejudiced or gave "the appearance of impropriety and prejudice against the plaintiff class." *Goebel v. Benton,* 830 P.2d 995 (Colo.1992). The state defendants joined in part in the disqualification motion. We reversed and remanded the case to the district court with directions for the respondent judge to recuse himself.

## II.

The plaintiffs challenge the lower court's certification of the class on three separate grounds, arguing that there is no basis in the Act for any of the following limitations imposed by the trial court: (1) the court's limitation of the class to those persons who are, as a result of mental illness, gravely disabled or a danger to others or them-

selves; (2) the requirement that members of the class reside and have received services in the northwest catchment area; (3) the court's limitation of the class to those who received care between June 1, 1981 and December 31, 1984. The relevant provision states in part:

Any person receiving evaluation or treatment under any of the provisions of this article is entitled to medical and psychiatric care and treatment, with regard to services listed in section 27–1–201(1)(a) to (1)(e) and services listed in rules and regulations authorized by section 27–1–202, suited to meet his individual needs, delivered in such a way as to keep him in the least restrictive environment.

§ 27–10–116(1)(a).[3]

### A.

The plaintiffs argue that the trial court erred in requiring members of the class to be gravely disabled or a danger to others or themselves as a result of mental illness. They argue that this requirement describes only those who may be involuntarily treated and that section 27–10–116 also creates a right to mental health services for those who have voluntarily received services under the Act, but who are not gravely disabled or a danger to themselves or others. Therefore, we must determine the extent of the right to services created by section 27–10–116.

■ Our primary task in construing a statute is to ascertain and give effect to the intent of the legislature. *Goebel I,* 764 P.2d at 797; *Woodsmall v. Regional Transportation Dist.,* 800 P.2d 63, 67 (Colo.1990); *People v. District Court,* 713 P.2d 918, 921 (Colo.1986). To determine legislative intent, we must look primarily to the language of the statute itself and then give effect to the statutory terms in accordance with their commonly accepted meaning. *Jones v. Cox,* 828 P.2d 218 (Colo. 1992); *Kern v. Gebhardt,* 746 P.2d 1340, 1344 (Colo.1987). The plain language of

section 27–10–116 states that "[a]ny person receiving evaluation or treatment under *any* of the provisions of this article is entitled to medical and psychiatric care and treatment." (Emphasis added.) The words *"any* person" and *"any* of the provisions" manifest the legislature's intent to provide mental health services on a broad basis. Under this language, chronically mentally ill persons who have received treatment, but who are not gravely disabled or a danger to themselves or others, have a right to treatment if they received evaluation or treatment under *any* provisions of the Act.

We will briefly discuss the general scheme of these provisions, and then consider the provisions which specifically address mentally ill persons who are not gravely disabled or a danger to themselves or others. Sections 27–10–103 to –109 of the Act define the different circumstances in which mentally ill persons receive services under the Act. Section 27–10–103 is labelled "voluntary application for mental health services" and primarily deals with the voluntary application for services by a minor. Section 27–10–105 provides for the evaluation of individuals who, as a result of mental illness, appear to be gravely disabled or a danger to themselves or others. Section 27–10–107 through section 27–10–109 provide for certification of individuals who, upon evaluation, have been determined to be involuntarily treated and who have not accepted voluntary treatment.

The state argues that the legislative intent was properly interpreted by the trial court to include "voluntary" clients, who but for their consent to treatment would be certified for treatment under the Act because of their dangerousness or grave disability. The state asserts that the only voluntarily treated persons, who receive services "under" the Act, are those who would otherwise be involuntarily treated. As support for its argument, the state cites section 27–10–107. Section 27–10–107 out-

---

**3.** The original statute in effect when this case began is quoted. As discussed above at 1038, the statute was amended in 1986 to add the phrase "subject to available appropriations" after the word "environment." The services listed in sections 27–1–201(1)(a) to (1)(e) include inpatient services, outpatient services, partial hospitalization, emergency services, and consultative and educational services. *See* § 27–1–201(1), 11B C.R.S. (1989).

lines the procedure under which a person may be certified for short-term treatment if upon evaluation that person has been determined to be gravely disabled or a danger to others or himself, as a result of mental illness, and has chosen not to accept voluntary treatment or reasonable grounds exist to believe that the person will not remain in a voluntary treatment program. We are not persuaded by this argument.[4]

Although the Act does give the opportunity for voluntary treatment to persons who qualify for involuntary treatment, the Act does not limit services to those whose mental health has deteriorated to such a point. The plaintiffs correctly note that section 27–10–103(1) governs voluntary applications for services and that nothing in that section requires that these patients be so mentally ill as to pose a danger to themselves or others or to be gravely disabled. Moreover, section 27–10–103 states that "nothing in [the Act] shall be construed in any way as limiting the right of any person to make voluntary application at any time to any public or private agency or professional person for mental health services." See *Taylor*, 618 P.2d at 1140 (applying section 27–10–103(1) to determine whether the physician-patient privilege should be applied where mentally ill person voluntarily sought out treatment).

In addition, section 27–10–105(4) provides that if it is determined that a person who has been detained under the emergency procedure no longer needs evaluation or treatment, that person shall be released and referred for further care and treatment on a *voluntary* basis. There is no language to suggest that the voluntarily treated person under this section must be gravely disabled or a danger to himself or others. On the contrary, the chronically mentally ill person addressed in this section has specifically been determined *not* to be a danger or gravely disabled under the evaluation provided for by this section. The section provides that either the detained person shall be certified for treatment pursuant to section 27–10–107, in which case that person has been determined to be a danger to himself or others or gravely disabled, or the person "shall be released [and] referred for further care and treatment on a voluntary basis." § 27–10–105(4). Thus, we hold that, for purposes of section 27–10–116, a person need not be so mentally ill as to be gravely disabled or a danger to himself or others.

4. We also reject the defendants' argument that our decisions in *People v. District Court*, 797 P.2d 1259 (Colo.1990) and *People v. Taylor*, 618 P.2d 1127 (Colo.1980), held that the Act does not apply to voluntarily treated persons. In *Taylor*, we distinguished between those persons who are involuntarily detained for evaluation and those persons who voluntarily seek treatment. We held that the patient-physician privilege prohibits the disclosure of information obtained during voluntary treatment. We based that decision on two policy considerations: (1) the rationale underlying the physician-patient privilege of encouraging full disclosure by a patient and protecting the patient from embarrassment, and (2) the Act's purpose of encouraging voluntary application for treatment. In deciding whether the patient-physician privilege should apply to information obtained during voluntary consultations initiated by a person who had not been evaluated and determined to be dangerous or gravely disabled, we looked to the legislative purpose of the Act. *Id.* at 1140–41. We implied that if the information sought to be protected had been obtained through an evaluation of an involuntarily detained person (citing § 27–10–106 and § 27–10–105), the privilege would not have applied. *Id.*

In *District Court*, we expressly held that information obtained during the evaluation of a person involuntarily detained may be disclosed under section 27–10–120(1)(e) if it is necessary to the administration of the provisions of the Act. We distinguished *Taylor* on the grounds that *Taylor* involved information obtained during a voluntary consultation and "expressly recognized [that] one of the purposes of the civil commitment statute is to encourage the use of voluntary rather than involuntary treatment," while *District Court* involved an emergency evaluation and section 27–10–120(1)(e) applies to information obtained during an emergency evaluation as well as information obtained during involuntary treatment. *District Court*, 797 P.2d at 1266. Therefore, while the physician-patient privilege under section 13–90–107(1)(d) may be applied where voluntary treatment is involved and disclosure is not needed to administer the provisions of the Act, section 27–10–120(1)(e) bars the application of the privilege where the information obtained is integral to providing further treatment under the Act. We conclude that *Taylor* and *District Court* are consistent with our decision here. Under those cases, the Act applies to both voluntarily and involuntarily treated mentally ill persons.

The notion that the truly voluntarily treated persons, *i.e.*, those who are chronically mentally ill, but not so mentally ill as to be gravely disabled or a danger to themselves or others, are entitled to treatment under the Act is supported by the Act's purpose. The purpose, stated in part by section 27–10–101(1)(a), is to "secure for each person who may be mentally ill such care and treatment as will be suited to the needs of the person and to insure that such care and treatment are skillfully and humanely administered with full respect for the person's dignity and personal integrity." *See* § 27–10–101(1). " 'Mentally ill person' is defined by the statute as a person with a substantial disorder of the cognitive, volitional, or emotional processes that grossly impairs judgment or capacity to recognize reality or to control behavior...." § 27–10–102(7). The stated purpose contains no language to the effect that those who are not so mentally ill as to be an imminent danger to themselves or others or gravely disabled should be excluded from services. Therefore, the apparent legislative intent was to provide services to *all* mentally ill persons as defined.

In fact, the Act was intended "[t]o encourage the use of voluntary rather than coercive measures to secure treatment and care for mental illness." § 27–10–101(1)(d). We have recognized that "[t]he civil commitment statutes must be liberally construed to promote [this] legislative purpose." *Taylor*, 618 P.2d at 1140; *Goedecke v. State Department of Institutions*, 198 Colo. 407, 603 P.2d 123 (1979). Therefore, we conclude that the provisions of the Act were intended to apply to those who are mentally ill and seek treatment before they become so mentally ill as to be dangerous or gravely disabled. This conclusion is consistent with the additional legislative objective of providing "treatment *as is suited to the needs of the person* under conditions which are as least restrictive of liberty as practicable." *People v. Chavez*, 629 P.2d 1040, 1054 (Colo.1981) (emphasis added); *see* § 27–10–101(1)(d).

We arrived at the same conclusion in *Goebel I*, in which we considered the defendants' argument that the Act applies only to involuntarily hospitalized patients:

Although we reject the assertion that the Care and Treatment Act in this respect applies only to involuntarily hospitalized patients, ... we conclude that the trial court abused its discretion in certifying the plaintiff class as the class appropriate with respect to each of the claims asserted.

*Id.*, 764 P.2d at 793. We specifically considered and rejected the defendants' argument that the right set forth in section 27–10–116(1)(a) applies only to those who are involuntarily hospitalized. *Id.* at 797. We concluded that reading the Act "as providing rights to both voluntary and involuntary patients is fully consistent with the language of the act and the legislative intent expressed in section 27–10–101," *id.*, 764 P.2d at 797, which is to address the needs of *all mentally ill persons. Id.* at 796 (emphasis added).

The language in *Goebel I* to which the trial court referred in limiting the class to those who are gravely disabled or pose an imminent danger to themselves or others was taken from that portion of the opinion in which we described the general background and scheme of the Act:

The Care and Treatment Act was enacted in substantially its present form in 1973 and provides comprehensively for the commitment, care and treatment of persons who are mentally ill and, as a result of mental illness, a danger to others or to themselves or gravely disabled. The act encompasses both *voluntary* and involuntary treatment, to be administered in designated hospitals and other mental health facilities.

*Id.*, 764 P.2d at 796 (emphasis added). Although we specifically mentioned those who are dangerous or gravely disabled in our description of the general scheme of the Act, the opinion in its entirety interpreted the Act to encompass all mentally ill persons. Our language, recognizing that the purposes of the Act extend "comprehensively to address the needs of all mentally ill persons," supports this reading of the opinion. *Id.* Such language logically

includes those who voluntarily seek treatment before they reach the point of mental illness resulting in grave disablement or danger to themselves or others.

■ The trial court here misconstrued our language in *Goebel I* to limit the meaning of "voluntary" to those who voluntarily seek treatment, but could be involuntarily treated. We did not intend to impose such a limitation then, and we see no reason to so limit section 27–10–116 now. We conclude that the trial court's certification of the class under C.R.C.P. 23 is too narrow, and that the class should be construed to include those who voluntarily receive mental health services and could not be involuntarily committed.

### B.

■ The plaintiffs also contend that the trial court erred in limiting the right declared in section 27–10–116 to those persons who both reside, and who have received evaluation or care, within the northwest catchment area of Denver. They argue that neither the pleadings nor the evidence at trial were limited in such a way, and that this action was originally commenced on behalf of all chronically mentally ill persons residing in the northwest catchment area at any time after June 1, 1981 who received evaluation, care or treatment at any mental health facility in the state.

We believe the class should be confined to the geographical parameters which originally were pleaded in the complaint. The plaintiffs concede that "the action was brought on behalf of persons who resided in northwest Denver." Despite this fact, the plaintiffs contend that because the Denver catchment areas have been consolidated, the class should no longer be limited to just the northwest catchment area. We reject this argument and hold that the class should be limited to those residing in the northwest catchment area. Although it was impossible for the plaintiffs to anticipate the change in service areas and amend their pleaded description of the plaintiff class before trial,[5] it would be unfair to allow expansion of the class now.[6] The plaintiffs chose not to include all Denver residents in their original pleadings and the defendants proceeded to trial on the belief that the plaintiffs desired to limit the class to those who reside in the northwest catchment area. The issues and evidence were shaped according to this belief. Therefore, we approve of the trial court's requirement that the plaintiffs reside in the northwest catchment area.

It is necessary to review the original pleadings to determine whether the plaintiff class should be limited to those who have received services within the northwest catchment area.[7] We conclude that the language in the plaintiffs' complaints does not foreclose them from arguing that the class should include those who received

**5.** The December 1984 change in provider of community mental health services, upon which the plaintiffs' desired expansion of the class definition is based, occurred long after the September 1982 trial.

**6.** Although the plaintiffs filed a March 8, 1989 motion for recertification of the plaintiff class, requesting that the trial court recertify the class to include "all chronically mentally ill persons who at any time from and after April 1, 1981, to the present have resided *within the City and County of Denver ...*," this request occurred too long after the commencement of this action to give the defendants fair notice.

**7.** The complaint filed by Plaintiffs Arevalo, Griffith, Phares and Pemberton stated:
  Plaintiffs Arevalo, Griffith, Phares, and Pember[t]on sue on their own behalf and, pursuant to Rule 23 of the Colorado Rules of Civil

Procedure, on behalf of a class of persons: (a) who are low income; (b) who are chronically mentally ill; (c) whose chronic mental condition requires coordinated community support services to support them in the community rather than in more restrictive environments; (d) for whom the DHH Mental Health Program was on June 1, 1981, is currently, or will be during the pendency of this action, the designated mental health center responsible for their care.

The request for hearing and C.R.C.P. 23(b) class certification filed by Ruth Goebel asserted the following position:
  The class consists of all those persons who are now entitled or who will in the future be entitled to aftercare, followup, and supportive services in the community from [Denver General Hospital] DGH pursuant to ... [the Act].

care from a facility located outside the northwest catchment area. *See Thomas Wells and Associates v. Cardinal Properties, Inc.,* 192 Colo. 197, 557 P.2d 396 (1976) (pleadings are to be construed in favor of the pleader); *Spomer v. City of Grand Junction,* 144 Colo. 207, 355 P.2d 960 (1960). The complaints named, as members of the class, those who are *entitled* to mental health services from a northwest catchment area facility. The complaints did not limit the class to those who *received* mental health services within the northwest catchment area. Moreover, the trial court's findings of fact support the conclusion that there were no geographical limitations based on the place where evaluation or treatment was received.[8] Therefore, we hold that members of the class must reside in the northwest catchment area, but are not required to have received treatment there.

### C.

██ In addition, because the DHH ceased to operate as a community mental health center on December 31, 1984, the trial court limited the class to violations occurring on or before that date. The plaintiffs argue that there is no logical basis for imposing a temporal limit on the class, so as to restrict the class to those who were treated under the Act prior to December 31, 1984. We conclude that the change in direct provider of community health services in Denver is not so critical as to warrant restricting the class to those who received services on or before December 31, 1984.[9]

The state has been responsible for mental health care services since the beginning of this action, and the city continues to deliver long-term and short-term inpatient mental health care under §§ 27–10–105 to – 109. Furthermore, the trial court's order of December 31, 1990 reveals the ongoing necessity for a plan that better fulfills the statutory right to treatment under the Act. There has been no finding that the alleged inadequate treatment ceased as of December 31, 1984. Thus, the provision of mental health services by private organizations has not altered the inadequacy of community mental health services provided in the northwest catchment area. The defendants' continued involvement, including that of the municipal defendants as long- and short-term inpatient provider, and the continuing inadequacy of the services dictate that the class definition not be restricted simply because Denver stopped providing certain types of services under the Act. There is no compelling reason to exclude from the class those people whose rights were violated after 1984. Therefore, we conclude that the fact that the community mental health services were provided pursuant to contract by a private organization after 1984 does not limit the definition of the class.

### D.

██ Finally, we address the state defendants' additional argument that the trial court's definition of the class was incorrect, based on its failure to require that all class members have been previously hospitalized because of their mental illness.[10] The defendants rely on language from *Goebel I* as support for the proposition that services provided "under" the Act involve prior hospitalization. Specifically, they refer to our language stating:

> The [trial] court determined that the [Act] creates a statutory right to appropriate treatment in the community for

---

8. In the trial court's May 7, 1985 order, the court concluded that "[i]n Colorado, hundreds of chronically mentally ill persons released from Colorado State Hospital came to the Northwest Catchment Area, specifically to Capitol Hill, where many of these identical individuals remain today. It would appear that many of them are not receiving adequate mental health treatment suited to their needs. They have largely been abandoned in the community."

9. The fact that DHH no longer provides community mental health services may affect the scope of relief ordered against the municipal defendants but, as shown above, is not a ground for limiting the definition of the class.

10. The defendants raise this argument as a subissue of the one on which we granted certiorari, *i.e.,* whether the district court's definition of the class was proper.

patients who have been voluntarily or involuntarily hospitalized. . . .

. . . . .

[T]he plaintiffs contend that the [Act] provides a right to appropriate care and treatment for the chronically mentally ill, both while hospitalized for treatment and while living in the community after discharge.

. . . . .

The trial court determined that, pursuant to this act, "known diagnosed chronically mentally ill persons have a statutory right to care and treatment in the community." The court concluded that this right applied to both those who have been inpatients under involuntary certification and those who have been inpatients on a voluntary basis.

*Goebel I,* 764 P.2d at 790–791, 796. The defendants argue that by portraying the trial court rulings and pleadings in such a way, we articulated a statutory interpretation whereby services "under" the Act must involve hospitalization. We reject this argument.

Section 27–10–116 does not require a person to have had prior hospitalization before that person is entitled to mental health services. We decline to construe the phrase "[a]ny person receiving evaluation or treatment under any of the provisions of this article" to mean that a person must have been hospitalized. *See A.B. Hirschfeld Press, Inc. v. City and County of Denver,* 806 P.2d 917 (Colo.1991) (In interpreting the comprehensive legislative scheme, we must give meaning to all portions thereof and construe statutory provisions to further legislative intent.). Instead, we recognize, as in part IIA, that the Act provides for a variety of services. We conclude that if a person has received either evaluation or treatment services under the Act, that person is entitled to the mental health services specified in section 27–10–116.

### III.

We hold that the trial court erred in limiting the class to those persons who received evaluation or treatment in the northwest catchment area before 1984 and in misconstruing the law to limit the class to those who are so mentally ill as to be gravely disabled or a danger to themselves or others. We also conclude that the trial court's imposition of the requirement that members reside in the northwest catchment area, and its omission of the prior hospitalization requirement, was proper. Accordingly, we reverse in part and affirm in part the trial court's certification of the class. The case is remanded to the court of appeals for further proceedings consistent with this opinion.

VOLLACK, J., does not participate.