YUMA COUNTY BOARD OF EQUALIZATION, and Board of Assessment Appeals of the State of Colorado, Petitioners,

v.

CABOT PETROLEUM CORPORATION, Respondent.

No. 92SC597.

Supreme Court of Colorado, En Banc.

July 26, 1993.

Rehearing Denied Aug. 23, 1993.

Benedetti and Dee, Robert H. Dee, Yuma County Atty., Wray and Francis A. Benedetti, Delray Beach, FL, for petitioner Yuma County Bd. of Equalization.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., and Larry A. Williams, First Asst. Atty. Gen., Gen. Legal Services Section, Denver, for petitioner Bd. of Assessment Appeals of State of Colo.

Gorsuch, Kirgis, Campbell, Walker and Grover, Robert J. Kapelke and Andrew D. Cohen, Denver, for respondent.

Justice VOLLACK delivered the Opinion of the Court.

Petitioners, Yuma County Board of Equalization (BOE) and the Board of Assessment Appeals of the State of Colorado (BOAA), petition from the court of appeals opinion in *Cabot Petroleum Corporation v. Yuma County Board of Equalization,* 847 P.2d 152 (Colo.App.1992), wherein the court of appeals determined that certain property tax assessments imposed on oil and gas leasehold interests were impermissibly retroactive and could not stand. We reverse and remand for further proceedings consistent with this opinion.

I.

On May 13, 1982, Cabot Petroleum Corporation (Cabot) entered into a gas purchase contract with Cities Service Gas Company wherein Cabot agreed to sell a proportionate share of gas produced from wells owned by Cabot on certain oil and gas leases on land located in Yuma County, Colorado.[1] The price term of the contract stated in part as follows:

> (a) For gas received during the month of April, 1982, the price shall be three dollars and nine and three-tenths cents ($3.093) per million (1,000,000) Btu's.[2]

> (b) For gas received during each succeeding month thereafter, the price per million (1,000,000) Btu's shall be the applicable price determined in accordance with the Natural Gas Policy Act of 1978, as such price may be revised from time to time by the Federal Energy Regulatory Commission.

---

1. Some of the wells were located in Kit Carson County, Colorado.

2. The gas purchase contract specified that "Btu shall mean a British thermal unit, which is the amount of heat required to raise the temperature of one pound of water one degree (1[degree]) Fahrenheit."

Northwest Central Pipeline Corporation, later renamed Williams Natural Gas Company, subsequently succeeded Cities Service Gas Company as the purchaser under the gas purchase contract.

In January 1985, Williams Natural Gas Company (Williams) ceased paying Cabot the contract price for the gas. Shortly thereafter, Cabot commenced an action against Williams in district court. In March 1985, Cabot sent a letter to its royalty interest owners, stating as follows:

Under our division orders, we have been settling for your royalty share of gas from each well you participate in at the unit price [Williams] pays to Cabot. [Williams] began paying us less for the gas for January 1985 production and they have asserted our contract with them permits the price reduction.

Because of [Williams'] price reduction, your March 1985 royalty check has been reduced to the price for the gas paid to Cabot.

Cabot is taking action through the courts to protect our mutual interests and we will continue to notify you from time to time of developments that may affect your payments. We regret the inconvenience to you that [Williams] has caused by their price reduction.

In May of 1985, Cabot sent a second letter to its royalty interest owners, stating the following:

With reference to our letter to you dated March 22, 1985, please be advised that [Williams] has again reduced the price they pay for gas from wells in which you participate as a royalty owner. Because of [Williams'] price reduction, your April, 1985 check has been reduced to the price for the gas paid to Cabot.

Cabot has taken action against [Williams] in the District Court of Yuma County, Colorado. The case is titled *Cabot Petroleum Corporation v. [Williams]* and can be found at Case No. 85–CV–13. Although Cabot is vigorously prosecuting the case, the Court has entered a temporary stay of proceedings because of a case filed by [Williams], in U.S. District Court.[3] We are urging the judge to move our case more rapidly so that our contract can be enforced as quickly as possible.

In October 1985, Cabot sent a third letter to its royalty interest owners indicating that Williams had again reduced the price for gas purchased, and that the decrease would be reflected as of August 1985.

On June 25, 1986, Cabot filed a second amended complaint against Williams, contending that, since 1985, Williams purchased gas from Cabot, but paid Cabot an amount three to four times less than the price specified in the gas purchase contract. Cabot sought to recover the difference between the price paid and the contract price, among other things.

Approximately four years later, on December 14, 1988, Cabot and Williams entered into a settlement agreement and release wherein Williams agreed to pay Cabot $6,200,000. Of the total, $4,700,000 represented value for gas sold to Williams from February 1985 through September 1988.[4]

During the years 1986, 1987, and 1988, Cabot filed annual statements pursuant to section 39–7–101, 16B C.R.S. (1982), which requires all operators of oil or gas leaseholds to file a statement showing "[t]he selling price at the wellhead of all oil or gas sold or transported from the premises during the calendar year." § 39–7–101(1)(d), 16B C.R.S. (1982).[5] Cabot, however, reported the actual amount received from Williams as the selling price, despite the

---

3. *See Northwest Central Pipeline Corp. v. JER Partnership,* 943 F.2d 1219 (10th Cir.1991).

4. In 1988, Cabot's wells were "shut in," and no gas was produced in 1989 or thereafter. An examination of the settlement reveals that, from the period commencing in November 1987 and ending in April 1988, Williams paid Cabot the contract price for gas sold.

5. The information contained in the annual statement provides the basis upon which the county assessor values oil and gas leaseholds for the purpose of real property taxation. *See* § 39–7–102, 16B C.R.S. (1982).

existence of the contract price term. Thus, during the years 1986, 1987, and 1988, Cabot paid real property taxes assessed on the amount actually received from Williams and not on the higher price.

On February 24, 1989, Cabot mailed a fourth letter to its royalty interest owners stating that "Cabot has communicated with you from time to time concerning its litigation against Williams ... for their action in reducing the price paid Cabot for gas sales from our wells in Yuma County, Colorado." Cabot continued, stating that

> Cabot has reached a settlement of its litigation against Williams, which results in the enclosed check for your share of the added payment for royalty from gas sales.... The value of the additional price is shown in the appropriate line on your check and is computed after reduction by the amount necessary to pay ... ad valorem taxes.

In March, the Yuma County Assessor learned that Cabot had received $4,700,000 from Williams in settlement of its claims against Williams.[6]

On August 7, 1989, the Yuma County Assessor provided Cabot with "new tax notices for the years 1986, 1987 and 1988, showing the adjusted taxes based on the 4.7 million dollar settlement for gas production revenue received from Williams." The assessment was made "on gas revenue which [Cabot] failed to report for the years 1986, 1987 and 1988." The new tax assessment was estimated in the amount of $315,511.

On August 25, 1989, Cabot protested the assessment by letter, which protest was subsequently denied. Cabot appealed the denial of its protest to the BOE, and the BOE subsequently issued a report on October 31, 1989, wherein the BOE noted that Cabot received $4,700,000 "as an adjustment to the well head price of gas produced by Cabot" during the years 1986, 1987, and 1988. The BOE denied Cabot's protest to

the new tax assessment in the amount of $315,511.

Cabot appealed the determination to the BOAA. After a hearing, the BOAA concluded that the Yuma County Board of Commissioners had the authority to retroactively impose *ad valorem* taxes upon Cabot for the years in question, pursuant to section 39–5–125, 16B C.R.S. (1982), and to *Chew v. Board of Assessment Appeals*, 673 P.2d 1028 (Colo.App.1983).[7] The BOAA additionally concluded that Cabot,

> the royalty interest owners, and the Assessor did not consider the price paid by Williams for the gas the true "selling price." It is undisputed that the "selling price" was three to four times greater than that paid by Williams, and, because of that, [Cabot] sued Williams for the difference between price paid and contract price.

The BOAA determined that the $4.7 million settlement should be reduced by litigation costs and expenses prior to being assessed for taxes. The BOAA stated that "such costs and expenses shall be prepared, submitted, and verified by [Cabot's] counsel." The BOAA entered an order on March 25, 1991, setting the total tax due at $200,967.40.

Cabot appealed to the court of appeals, and the BOE filed a cross-appeal. The court of appeals concluded that "the retroactive property tax assessments are unlawful because there was no statutory authority for the assessor to make such assessments under the circumstances" of the present case. *Cabot Petroleum Corp. v. Yuma County Board of Equalization*, 847 P.2d 152, 154 (Colo.App.1992). The court of appeals premised its conclusion in part on the fact that Cabot did not omit property from its annual statement. The court of appeals found that sections 39–5–125 and 39–10–101(2)(a), 16B C.R.S. (1982), "authorize retroactive assessments of additional property taxes only against 'omitted *property* ' and not against 'omitted *value.* ' "

---

6. The Yuma County Assessor, Roberta Helling, testified at a hearing before the BOAA that she was a royalty interest owner in this case and did receive the letters from Cabot.

7. Section 35–5–125, 16B C.R.S. (1982), permits assessors to retroactively assess taxes when taxable property has been omitted from an assessment roll.

*Id.* at 155. The court of appeals additionally rejected the BOE's argument that it had authority to retroactively impose *ad valorem* taxes on the ground that Cabot's annual statements were "willfully false and misleading." *Id.*

The BOE sought review in this court, raising several issues for our review.

## II.

■ The first issue on which we granted certiorari is

[w]hether the court of appeals erred in its opinion that §§ 39-7-104 and -105, 16B C.R.S. (1982), do not permit retroactive assessments for ad valorem taxes when the gas leaseholds had not been correctly valued because of actions taken by the taxpayer.

The BOE and BOAA contend that the court of appeals erred in its determination that sections 39-7-104 and 39-7-105 are "inapplicable and provide no authorization for the retroactive assessments in this case." *Cabot,* 847 P.2d at 156. We agree, and conclude that those sections permit the retroactive assessment of taxes in the present case.

Sections 39-7-104 and 39-7-105 are part of Article 7 of Title 39, which governs the valuation of oil and gas leaseholds and lands for the purpose of property taxation. Generally, the purpose of Article 7 is to ensure that real property is uniformly taxed, premised on uniform assessment of property values. *See* Colo. Const. art. X, § 3 (each property tax levy shall be uniform upon all real and personal property); *see also Denver Urban Renewal Auth. v. Byrne,* 618 P.2d 1374 (Colo.1980) (holding that the burden of property taxation must be uniform on the same class of property within the jurisdiction levying the tax); *Citizens' Comm. for Fair Property Taxation v. Warner,* 127 Colo. 121, 254 P.2d 1005 (1953) (holding that the assessment of all property throughout the state be relatively uniform and at its true and just cash value). Under Article 7, assessors "shall value ... oil and gas leaseholds and lands for assessment, as real property, at an amount equal to eighty-seven and one-half percent of: (a) The selling price of the oil or gas sold therefrom during the preceding calendar year." § 39-7-102(1)(a), 16B C.R.S. (1982). Accordingly, every operator of any oil or gas leasehold must "sign under the penalty of perjury in the second degree, and file with the assessor of the county wherein such oil and gas leaseholds or lands are located a statement ... showing: ... (d) [t]he selling price at the wellhead of all oil or gas sold." § 39-7-101(1)(d).

The act emphasizes the requirement of accuracy in the content of annual statements by punishing as second degree perjury any false statement willfully and knowingly made in a mandatory annual statement. § 39-7-106, 16B C.R.S. (1982). Additionally, if an assessor discovers that a statement, or any part of an annual statement filed, is "willfully false or misleading," the assessor may then re-value and re-assess taxes on the same property "on the basis of the best information available to and obtainable by him [or her]." § 39-7-105, § 39-7-104.

In the present case, the BOAA found that Cabot

did not consider the price paid by Williams for the gas the true "selling price." *It is undisputed that the "selling price" was three to four times greater than that paid by Williams, and, because of that, [Cabot] sued Williams for the difference between price paid and contract price.*

These findings, which are supported by the record, reveal that Cabot knew that it was not accurately reporting the selling price as required by section 39-7-101 when it filed annual statements in the years in question.

A lawsuit regarding the disputed contract selling price was commenced in 1985. Approximately four years later, in December 1988, Cabot entered into a settlement agreement with Williams. During that four-year period, Cabot sent letters to its royalty interest owners, informing them of the status of the litigation initiated in order to recover the difference between the contract price and the price Cabot received.

Cabot's actions, with respect to the lawsuit and to the letters, reveal that Cabot knowingly reported selling prices that it did not believe to be the selling price in its annual statements.

We thus disagree with the finding of the court of appeals that "nothing in the record would warrant a finding that [Cabot] filed willfully false and misleading annual statements." *Cabot*, 847 P.2d at 156. We find that Cabot's annual statements were both willfully false and misleading when considered in light of the purposes of the statutory scheme. *See Goebel v. Department of Institutions*, 830 P.2d 1036, 1040 (Colo. 1992) (holding that this court's primary task in construing statutes is to give effect to the intent of the General Assembly; we first look to the language of the statute and give words their commonly accepted meanings); *Dunlap v. Colorado Springs Cablevision, Inc.*, 829 P.2d 1286, 1298 (Colo.1992) (holding that this court should adopt a construction that best effectuates the purposes of a legislative scheme); *Webster's Third New International Dictionary* 819, 1444 (1969) (defining misleading as "so vague as to be really meaningless, if not inaccurate," and defining false as "not corresponding to truth or reality.").

### III.

■ We additionally granted certiorari to consider whether

the term "selling price," as used in §§ 39–7–101 to –108, 16B C.R.S. (1982), means the amount of money actually received by the owner or operator at the time the oil or gas is delivered from the wellhead, or the amount of money that is provided in a contract of sale between the owner or operator and the purchaser of the oil or gas and collected under the contract at a later date.

We find that the term "selling price" refers to the amount of money actually received; we conclude that, when purchasers and sellers dispute the selling price, it is incumbent upon the seller to inform the assessor of such dispute.

As previously noted, under section 39–7–102, "the assessor shall value … oil and gas leaseholds and lands for assessment, as real property, at an amount equal to eighty-seven and one-half percent of: (a) The selling price of the oil or gas sold therefrom during the preceding calendar year." § 39–7–102(1)(a). The assessor's valuation is premised upon the owner or operator's annual statement filed pursuant to section 39–7–101.

These statutory provisions are part of the statutory scheme regulating the imposition of property taxes. In section 39–1–101, the General Assembly has declared that "it intends to prescribe methods by which *the actual value* of all taxable property in the state shall be determined, and to fix the percentage of such determined actual value at which all such property shall be assessed for taxation." § 39–1–101, 16B C.R.S. (1982) (emphasis added). With respect to real property other than oil and gas leaseholds and lands, the General Assembly has provided that "[t]he actual value of such property … shall be that value determined by consideration of the following factors, insofar as the same are applicable to any property: … market value in the ordinary course of trade." § 39–1–103(5)(a), 16B C.R.S. (1982).

■ When construing statutes, it is our primary task to give effect to the intent of the General Assembly. *Goebel*, 830 P.2d at 1040; *Dunlap*, 829 P.2d at 1298. We construe statutes related to the same subject matter *in pari materia*, in order to give consistent, harmonious, and sensible effect to all of their parts. *Dunlap*, 829 P.2d at 1298; *Walgreen Co. v. Charnes*, 819 P.2d 1039, 1043 (Colo.1991). We conclude that the term "selling price" refers to the actual amount of money received by the owner or operator for the sale of oil or gas, as it is the value most closely indicative of market value in the ordinary course of trade. *See* Cecil L. Smith, *Federal Taxation of Oil and Gas Transactions* § 13.-03, at 13–4 (1987) ("Perhaps the best evidence of the value of a producing oil and gas property is the price for which it was sold in an arm's length sale within a short

time of the valuation date."). The actual selling price most closely effectuates the General Assembly's expressed intent that the actual value of property should serve as the basis for real property tax assessments. *See* § 39–1–101.

We note, however, that there may be cases such as the present case where the actual selling price may not be determined within one calendar year; for example, when owners or operators dispute the actual amount of the selling price, or cases when owners or operators agree to accept delayed payments. In such cases, the actual selling price received may not be ascertained until after the completion of a lawsuit or after a specified calendar year has ended. In these cases, it is incumbent upon owners or operators of oil or gas leaseholds and lands to report this information in mandatory annual statements, in order to accurately reflect the selling price of all oil or gas sold.

## IV.

We granted certiorari to consider the following additional issues:

> Whether taxable property has been omitted from the assessment rolls where the owner of an oil or gas leasehold intentionally reports only that portion of the selling price that is actually received during the preceding year.

> Whether the taxpayer is entitled to an exemption from ad valorem taxation pursuant to article X, section 3 of the Colorado Constitution.

With respect to the first issue, the BOE and the BOAA contend that the court of appeals erred in determining that omitted value of property is the equivalent of omitted property for the purposes of section 39–5–125, 16B C.R.S. (1982), and that the settlement should be taxed accordingly. With respect to the latter issue, the BOE and the BOAA contend that the effect of the court of appeals opinion is to give Cabot an exemption from property taxation during the years in dispute, which is not legally justifiable.

Since we conclude that Cabot must pay property taxes as assessed under sections 39–7–105 and 39–7–104, we do not address these issues. The judgment of the court of appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.