**CATHOLIC MEDIA GROUPS, INC., Petitioner–Appellee and Cross–Appellant,**

v.

**Natalie MEYER, Secretary of State, Respondent–Appellant and Cross–Appellee.**

No. 93CA0148.

Colorado Court of Appeals, Div. V.

July 28, 1994.

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. (1993 Cum.Supp.).

DiGiacomo & Jaggers, David R. DiGiacomo, Gerald H. Jaggers, Douglas J. Perko, Arvada, for petitioner-appellee and cross-appellant.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Laurie Rottersman, Asst. Atty. Gen., Denver, for respondent-appellant and cross-appellee.

Opinion by Judge HUME.

Petitioner, Catholic Media Groups, Inc., (CMG) appeals, and respondent, Natalie Meyer, Secretary of State of Colorado, (Secretary) cross-appeals from a judgment of the district court interpreting various provisions of the Bingo and Raffles Law, § 12–9–101, et seq., C.R.S. (1991 Repl.Vol. 5A) (Bingo Act). We affirm in part, reverse in part, and dismiss as moot one contention asserted on appeal.

The pertinent facts in this case are undisputed. Under the Bingo Act, a licensee is required to pay an administrative fee on the proceeds of "any game of chance" it conducts. CMG, as a licensee, submitted reports for the last quarter of 1991 and the first quarter of 1992 to the Secretary as required relative to bingo, raffle, and pull tab games conducted under its license. The Secretary later notified CMG by letter that the administrative fee had been underpaid for these two quarters.

On the reports, CMG had allocated and deducted certain rent and security guard expenses from the gross receipts for bingo as well as from the gross receipts for its pull tab games. CMG then subtracted the net loss on its bingo games from the net gains derived from its pull tab and raffle games. The administrative fee was paid based upon this calculation.

The Secretary informed CMG that expenses for rent and security could be deducted only from the gross receipts of bingo games and that the administrative fee was to be paid on the net proceeds of each game separately rather than the net proceeds of all games cumulatively.

As a result of these controversies, CMG filed a petition with the Secretary, under Secretary of State Rule 1, 8 Code Colo.Reg. 1505–4, requesting that certain declaratory orders be issued pertinent to calculation of the administrative fee. The Secretary issued an order rejecting CMG's interpretation of the statutes.

CMG subsequently filed a petition for review with the district court seeking to reverse the Secretary's decision. The district court affirmed the Secretary's decision in part and reversed in part. These appeals followed.

I.

CMG contends that the trial court erred in determining that the Secretary properly assessed an administrative fee pursuant to § 12–9–108(6), C.R.S. (1991 Repl. Vol. 5A), on the net proceeds of each game of chance separately, rather than on all the games cumulatively. We agree.

A statute must be interpreted in accord with the presumption that the General Assembly intended a fair, just, and reasonable result. Section 2–4–201(1)(c), C.R.S. (1980 Repl.Vol. 1B). Two statutory provisions concerning the same subject matter must, if possible, be construed together to arrive at a harmonious, just, and reasonable result consistent with such legislative intent. *Yuma County Board of Equalization v. Cabot Petroleum*, 856 P.2d 844 (Colo.1993).

In addition, a court should not follow a construction that leads to an absurd result. *State Board of Medical Examiners v. Saddoris*, 825 P.2d 39 (Colo.1992).

Section 12–9–108, C.R.S. (1991 Repl.Vol. 5A) contains provisions governing the quarterly reports that bingo-raffle licensees are required to submit to the Secretary. Section 12–9–108(1)(a), C.R.S. (1991 Repl.Vol. 5A) requires a bingo-raffle licensee to include in its quarterly reports the "net proceeds derived from *each* such game of chance...." (emphasis added) Section § 12–9–108(6), C.R.S. (1991 Repl.Vol. 5A) provides that an administrative fee "shall be paid ... upon the proceeds of *any* game of chance held, operated, or conducted under the provisions of this article...." (emphasis added)

CMG contends that the word "any," as used in § 12–9–108(6), means "all," which in turn means all games collectively conducted and reported by a given licensee. We agree with that contention.

In order for §§ 12–9–108(1)(a) and 12–9–108(6) to be read in harmony, we conclude that the General Assembly's intent was to require separate, rather than cumulative, reporting of the proceeds of each game conducted by the licensee for monitoring and regulatory purposes and for the application of proceeds in conformity with the statute. However, the aggregate net proceeds are used to calculate the fees required by § 12–9–108(6). In using the word "any" rather than "each," in the latter subsection governing fees, we conclude that the General Assembly intended the words to have different meanings.

We find further support for this conclusion in the fact that other provisions of the Bingo Act indicate a legislative intent to treat the authorized games separately for certain purposes. Thus, in § 12–9–102(11), C.R.S. (1991 Repl.Vol. 5A), "lawful use" is defined as "the devotion of the entire net proceeds of *a game of chance* to lawful purposes." (emphasis added) Again, in § 12–9–107(4), C.R.S. (1991 Repl.Vol. 5A), the General Assembly has provided that "the entire net proceeds of *any game* shall be devoted to a lawful use or uses." (emphasis added) These statutes support the necessity of separate itemization for purposes of reporting without affecting the construction of the subsection governing the computation of fees.

The statutory construction urged by the Secretary would allow different administrative fees to be imposed upon the same amount of net profits depending entirely upon whether the fee is calculated separately for each game or whether it is calculated on the aggregate profit from all the games. Under the Secretary's construction, a licensee who derived a profit of $1,000 in each of three allowable types of games of chance would be required to pay 3% of $3,000 or $90 in administrative fees, while another licensee who had a $5,000 profit from pull tabs, a $1,000 loss from bingo, and a $1,000 loss from raffles would be required to pay 3% of $5,000 or a $150 administrative fee on the identical net profit of $3,000.

Ordinarily, we accord "great deference" to the interpretation of the Secretary as the governmental authority charged with enforcing the Act. *El Paso County Board of Equalization v. Craddock*, 850 P.2d 702 (Colo.1993). However, in our view, such unequal and haphazard treatment of licensees is not fair, just, or reasonable. And, to the extent that the Secretary's construction thus leads to an unintended, unfair, and absurd result, we decline to accord the usual presumption in favor of the administrative agency's interpretation of the statutes in question.

## II.

█ CMG also contends that the trial court erred in failing to grant its request for a declaratory order providing that the term "net profits" as used in § 12–9–107(12), C.R.S. (1991 Repl.Vol. 5A), means net profits of all games of chance collectively, including pull tabs. We need not address this issue.

Section 12–9–107, C.R.S. (1991 Repl.Vol. 5A) includes general provisions governing the operation of the games of chance. At the time the trial court ruled on this issue, § 12–9–107(12) provided:

Any licensee which does not report, during any one-year period, net profits will be required to show cause before the licensing authority why its right to conduct games of bingo should not be revoked.

However, in 1993, the General Assembly amended that subsection such that it now provides:

> Any licensee which does not report, during any one-year period, net *proceeds* will be required to show cause before the licensing authority why its right to conduct games of *chance* should not be revoked. (emphasis added)

Section 12–9–107(12), C.R.S. (1993 Cum. Supp.).

As a result, because the words "net profits" were changed to "net proceeds" and the words "games of bingo" were changed to "games of chance," this issue is moot because the licensees will be able to rely upon the net proceeds of all authorized games in avoiding any future revocation of a license.

No revocation or suspension proceeding is pending under the prior law against CMG, and there is nothing in the record before us to support the conclusion that any such proceeding is contemplated by the Secretary. Hence, we conclude that CMG's contention is moot. *See Crowe v. Wheeler*, 165 Colo. 289, 439 P.2d 50 (1968); *W–470 Concerned Citizens v. W–470 Highway Authority*, 809 P.2d 1041 (Colo.App.1990).

### III.

The Secretary contends that the trial court erred in concluding that rent and security expenses for pull tab games are legitimate deductible expenses. We agree with the Secretary only as to security expenses.

At the time the trial court ruled on this issue, the provision governing allowable expenses for bingo-raffle licensees, § 12–9–108(5), C.R.S. (1991 Repl.Vol. 5A), provided:

> No item of expense shall be incurred or paid in connection with holding, operating, or conducting any game of chance pursuant to any license except bona fide expenses of a reasonable amount. Expenses may be incurred only for the following purposes ... payment for *services rendered* which are reasonably necessary for repairs of equipment, operating, or conducting *the game of bingo;* for *rent* if the premises are rented.... (emphasis added)

The term, "services rendered," is further defined in § 12–9–108(6), C.R.S. (1991 Repl.Vol. 5A), to include "a reasonable amount for security expense."

In 1993, however, Senate Bill 93–52 amended this provision. Section 12–9–108(5), C.R.S. (1993 Cum.Supp.) now provides:

> No item of expense shall be incurred or paid in connection with holding, operating, or conducting any game of chance pursuant to any *bingo-raffle* license except bona fide expenses of a reasonable amount. Such expenses include those incurred in connection with *all games of chance,* for the following purposes ... payment for *services rendered* which are reasonably necessary for repairs of equipment and operating or conducting *games of chance;* for *rent* if the premises are rented.... (emphasis added)

▇ When a statute is amended, it is presumed that the General Assembly intended to change the law. *Charnes v. Lobato,* 743 P.2d 27 (Colo.1987). Furthermore, an explicit subsequent legislative declaration concerning the intent of an earlier statute is entitled to considerable weight. *People v. Holland,* 708 P.2d 119 (Colo.1985).

▇ With respect to security expenses, the summary for Senate Bill 93–52, as originally introduced, states that the Bill "[a]llows licensees to deduct allowable expenses which formerly were not deductible from pull tab and raffle operations, as well as bingo." Hence, we conclude that, prior to the 1993 amendments, certain expenses such as security expenses were deductible only if they were incurred in connection with conducting bingo games.

▇ However, with respect to expenses for rent, a division of this court has previously held, under § 12–9–108(5), C.R.S. (1991 Repl.Vol. 5A) that "rent is a legitimate permitted expense for all games of chance, including raffles." *American Historical Society of Germans from Russia v. Meyer,* 794 P.2d 1025, 1029 (Colo.App.1989). The parties do not dispute the trial court's finding that pull tab games are "games of chance."

Therefore, we conclude that rent attributable to conducting pull tab games is a legitimate deductible expense.

Contrary to the Secretary's contention, we are unable to conclude that the 1988 amendment which added § 12–9–107(26), C.R.S. (1991 Repl.Vol. 5A) in effect overruled the decision in *American Historical Society, supra.* That added subsection provides:

No licensee shall sell, offer for sale, or put into play any pull tab ticket except at the location of and during its licensed bingo occasions or upon premises owned by or in the sole control of the licensee.

Even if we assume that this subparagraph requires a licensee to offer pull tab games at the site of and during licensed bingo occasions on the premises of the licensee, such requirement does not resolve the issue of allocation of expenses. Had the General Assembly intended to overrule *American Historical Society, supra,* any amendment to that effect would have addressed § 12–9–108(5) which was relied upon by the court as dispositive in reaching its decision.

In view of our resolution of the previous issue, we necessarily disagree with the Secretary's other contention that CMG improperly deducted rental expenses when determining its net profit on pull tab games.

Accordingly, the judgment is reversed insofar as it permits separate assessments of administrative fees for each game of chance conducted by a licensee and allows security expenses as a legitimate deductible expense for the pull tab games at issue here. The appeal is dismissed relative to CMG's request for an interpretation of former § 12–9–107(12). In all other respects, the judgment is affirmed.

CASEBOLT, J., concurs.

RULAND, J., concurs in part and dissents in part.

Judge RULAND concurring in part and dissenting in part.

Because I conclude that the trial court was correct in approving the fees imposed by the Secretary on each game of chance, I respectfully dissent from the result reached by the majority in part I of the opinion.

In addressing the quarterly reports that licensees are required to submit to the Secretary, as noted by the majority, § 12–9–108(1)(a), C.R.S. (1991 Repl.Vol. 5A) requires a licensee to include the "net proceeds derived from *each* such game of chance...." (emphasis added) Section § 12–9–108(6), C.R.S. (1991 Repl.Vol. 5A) then provides that an administrative fee "shall be paid ... upon the proceeds of *any* game of chance held, operated, or conducted under the provisions of this article...." (emphasis added)

The statute should be interpreted so as to give a consistent, harmonious, and sensible effect to all of its parts. *People v. Andrews,* 871 P.2d 1199 (Colo.1994). Contrary to the majority's conclusion, in order for § 12–9–108(1)(a) and § 12–9–108(6) to be read in harmony, in my view, an administrative fee is required from the proceeds of each game of chance separately. Otherwise, there would be *no* purpose in reporting separately on the proceeds of each game as required by § 12–9–108(1)(a).

Further, and most significant, to the extent that the statutory provisions before us may be characterized as vague or ambiguous, an appellate court must accord "great deference" to the interpretation of the Secretary as the governmental authority charged with enforcing the Act. *See El Paso County Board of Equalization v. Craddock,* 850 P.2d 702 (Colo.1993) (interpretation of taxation statute by property tax administrator); *McLeod v. Brittain,* 728 P.2d 1296 (Colo. 1986) (interpretation of statute governing trustee credit time by Department of Corrections); *Smith v. Myron Stratton Home,* 676 P.2d 1196 (Colo.1984) (fn. 4) (interpretation of Workers' Compensation Act by Industrial Commission).

Stated otherwise, the Secretary's interpretation may not be overturned unless that interpretation contravenes the plain meaning of the statute or violates the legislative intent as expressed in the statutory text. *See El Paso County Board of Equalization v. Craddock, supra; Boulder County Board of Equalization v. M.D.C. Construction Co.,* 830 P.2d 975 (Colo.1992). Under this standard of

appellate review, I perceive no basis for overturning the Secretary's interpretation and application of the statute.

To the extent that this interpretation is characterized by the majority as "absurd" because different fees may be imposed upon the same amount of gross proceeds, I again disagree.

The licensee obviously is not required to conduct any authorized game of chance that generates no profit. *See* § 12–9–107(12), C.R.S. (1991 Repl.Vol. 5A). Hence, to the extent that a licensee opts to do so, I credit the licensee and not the Secretary with creating a situation in which the administrative fees vary depending upon the financial success of each separate gambling game.

Conversely, the purpose of the law is to allow certain qualified non-profit organizations to generate funds from what are otherwise illegal gambling type activities. *See* § 12–9–104, C.R.S. (1991 Repl.Vol. 5A). Because of the special status granted these organizations for this limited purpose, the General Assembly clearly intends that these activities be monitored closely, including the proceeds specifically derived and disbursed from each authorized game of chance. *See* § 12–9–103 and § 12–9–110, C.R.S. (1991 Repl.Vol. 5A).

Hence, I conclude that, given these purposes, calculations of administrative fees relative to each activity by the Secretary is appropriate, and I would affirm the trial court's ruling on this issue. I concur with the remainder of the majority opinion.