# No. 19,841.

BARTLETT AND COMPANY, GRAIN, ET AL., *v.*
BOARD OF COUNTY COMMISSIONERS OF BACA COUNTY.
(382 P. [2d] 193)

Decided June 3, 1963.

Messrs. GORDON AND GORDON, for plaintiffs in error.

Messrs. SCHMIDT AND SCHMIDT, for defendant in error.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

THE parties appear here in the order of their appearance in the trial court. We refer to them as they there appeared, as plaintiffs, or Bartlett and Gano, and to the defendant as the Board.

Separate actions were commenced by Bartlett and Gano. Each sought relief from alleged illegal assessments and ad valorem taxes levied for the year 1958 against their properties situate in Baca County. Problems presented for adjudication are the same or similar in each case and the cases were consolidated for trial and one judgment entered.

From the record it appears that for several years prior to 1958, Bartlett and Gano each owned and operated several grain elevators in Baca County. They had paid taxes on their various properties each year, including taxes for the year 1957. Valuations on the various properties for the year 1958 were increased twenty-five percent above the 1957 valuations.

Bartlett and Gano protested the increases to the assessor and the Board, sitting as The Board of Equalization. Their protests were denied.

Bartlett and Gano, having exhausted their administrative remedies whereby they sought to have their

properties properly assessed, paid the taxes levied under protest, and commenced this action, claiming that the assessments were "unreasonable, arbitrary, discriminatory, not uniform, unequal and void, and resulted in oppressive and illegal taxes."

In their complaint they sought a complete review by the trial court of all proceedings culminating in the alleged illegal assessments and taxes and prayed for a determination that said assesments are void, and for judgments for refund of the amounts paid, together with interest and costs.

The Board by answer denied that the assessments were improper or void, and set up as an additional defense the fact that Bartlett and Gano had not exhausted their administrative remedies.

Trial was to the court. Plaintiffs, in order to establish the allegations of their complaint, offered the testimony of one Keats Soder, who dealt in, owned and operated grain elevators and qualified as an expert in determining the cash market value of grain elevators located in Baca County and of the type involved in this action. His appraisal of the properties involved was completed in May 1959. In making his appraisal he visited and examined each property, took into consideration the kind of materials used, the date of construction, the then condition of each property, and determined whether there had been recent additions or deletions.

In arriving at the 1958 "full cash value" of each item of property under consideration, he computed 1958 replacement costs and considered the same together with the accumulated depreciation from date of construction, average yearly net income derived from the last ten years' operation of each facility, the amounts for which he thought the various properties could be sold to a willing buyer, based partially on sales of elevators in Baca County, and also capitalized the properties on an income basis.

Predicated on such factors, he expressed his opinion as to the 1958 full cash value of each property. His testimony was clear and convincing and not questioned by anyone, nor was there any evidence to indicate or even intimate that his procedures for arriving at actual cash values were not proper or the values assigned correct.

Bartlett and Gano also called for cross-examination Lee J. Winkleman, who was then, and for ten years and four months last past had been, employed as an "Industrial Appraiser Engineer for the Colorado Tax Commission."

He testified that in 1952 he examined the subject properties, and, following procedures contained in a manual (not made available to the trial court or this court) supplied to him by the Colorado Tax Commission, determined the 1941 replacement costs of each property and pursuant to manual procedures depreciated that cost to 1952. He testified:

"Q. You don't pay any attention, then, for the purpose of arriving at the total value, of any business enterprise; you don't pay any attention, then, to the income or the sale value? A. No.

\*   \*   \*

"A. This appraisal was made in accordance with manual procedure, and I made no investigation of any profits. Q. Now, the only thing that the manual does, that you used, comes up with the reproduction cost as of 1941, is that correct? A. Correct. Q. It does not take into consideration income, market value or sales, does it? A. No."

After completing this appraisal, Winkelman turned the same over to the Director of Appraisals of the State Tax Commission, who presumably sent copies of the same to the then assessor of Baca County.

Jimmy Patterson, the assessor for Baca County during the years 1955-1959, testified that he never examined the properties for additions, deletions or condition, nor for

the purpose of arriving at the assessable value. He had never computed the values of the elevators. A portion of his testimony follows:

"Q. Whose value did you use to arrive at the assessment, Mr. Patterson? A. Tax Commission's. Q. Then you do not know how the Tax Commision arrived at making the assessment? A. No."

\* \* \*

"Q. Now, you testified, I believe, a while ago, that your assessment was made by direction from the State Tax Commission, is that correct? A. Yes, sir. Q. That is still correct? A. Yes.

\* \* \*

"A. I was using the basis of the Tax Commissioners. Q. Pursuant to the Tax Commission's direction? A. Yes.

\* \* \*

"THE COURT: What I am trying to find out is, what the State Tax Commission or its agent directed you to do with reference to these properties? A. Use them figures that Winkelman had given it and the normal added depreciation which would bring a figure higher than what was on the assessment rolls in 1957. THE COURT: And you complied with that directive, is that correct? A. That was my intention at the time.

\* \* \*

"THE COURT: And you took no other factors into consideration? You used solely this report to arrive at your assessed valuation? A. Yes."

\* \* \*

"THE COURT: And you used no other factors in considering the assessment, other than a change in the depreciation from Mr. Winkleman's report, is that correct? A. Yes, sir."

Patterson, the assessor, relied entirely upon Winkleman's appraisal setting forth 1941 reconstruction costs less depreciation through 1952. He had no idea as to the

procedures used by Winkleman in arriving at reconstructions costs.

He further testified that, acting under instructions given to him in the spring of 1958, he raised the assessed value of each subject property in the amount of twenty-five percent for that year. These increases were not Patterson's but were clearly the handiwork of the State Tax Commission.

"THE COURT: * * * upon what did you base the increase, that is my question? A. On the request of the Colorado State Tax Commission, and we agreed that was the assessed valuation. THE COURT: How was that request received by you? A. A week's visit of the Tax Commission. THE COURT: In what years? A. In 1958, the spring of 1958."

The foregoing contains the pertinent facts established by testimony and documentary evidence in which there was no substantial conflict.

On January 25, 1960, the court made detailed FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER. Pertinent portions thereof are as follows:

"That Plaintiffs, and each of them, have exhausted their administrative remedies before bringing this (consolidated) action; and the Court has jurisdiction."

* * *

"Patterson admits that the sole basis of his assessment for the year, 1958, was the Winkleman Report, using the 1952 Depreciated Value as computed, with further allowance for normal added depreciation; that no other factors were used by him in considering the assessment; that at no time during the year, 1958, did he personally inspect, or cause to be inspected the grain storage elevators to determine whether any additions or deletions had been made to said properties; that he assumed they were in the same condition as the previous years; that he had never personally computed their value.

"Both Patterson and Winkleman admit that the tax

manual procedure as used by Winkleman at reaching his appraisals in the subject property, and Patterson's assessment procedures did not take into consideration other criteria of value such as income, location, cost, actual sale value, or any other factor other than 1941 Replacement Cost as provided by the manual.

\* \* \*

"With respect to market value, the Court finds that the only evidence submitted was by Plaintiffs through their expert witness, Keats Soder, who testified as to market value, actual cash value, or market cash value (the terms being used interchangeably to mean the highest possible price when there is a willing seller & buyer) on the subject properties.

\* \* \*

"\* \* \* The evidence reveals that the properties herein involved were assessed from a low of 34.3% to a high of 134.8% of their true cash value."

\* \* \*

"That while the Constitutional and Statutory standard of assessment is full cash value, since the 1952 reappraisal program, the custom in this state as followed by the Tax Commission and the assessors of the 63 Counties is to assess and equalize assessments of real property at a value based upon 1941 replacement costs or some per centage thereof.

\* \* \*

"That, generally, the 'uniformity' provision of the Constitution relates to uniformity of taxes and not to uniformity of procedures; however, in order to make an equal distribution of county and state taxes it is essential that a uniform basis of valuation be adopted and adhered to.

"That where one class of property is assessed or [at] a higher value than all other classes of property and a standard in determining the value for assessment purposes is used, which does not conform to the standard

generally use [used], the taxpayer is entitled to a reduction in conformance to the standard.

"In the situation before the Court, much evidence was submitted as to actual cost [cash] value, replacement cost, and other standards of value and consequent relation to assessed valuation, however, it is evident to the Court that insofar as actual assessments procedures are followed:

" * * * The standard in Baca County (and generally throughout the entire state) is the 1941 replacement cost *or a per centage thereof* plus allowance for obsolescence or depreciation. To say that other factors such as location, cost, actual sale value, income, or other pertinent factors are being considered in actual assessment procedures is to resort to fiction and not fact." (Emphasis supplied.)

The court ordered that: " * * * this cause must be, and it is hereby remanded back to the County Board of Equalization [the Board], with the following instructions and directions, for further action by themselves and directing the assessor to:

"1. Remove from the tax rolls one piece of property assessed to Gano, the same being nonexistent.

"2. Add to the tax rolls other property owned by Bartlett and not assessed for the year 1958.

"3. Using the Winkleman Report, make additional allowance for depreciation for the elevator owned by Plaintiff Bartlett and located at Bartlett, Colorado, which was built in 1928, and not in 1947, as stated in the report. This allowance applies only for the year 1958 and subsequent years.

"4. To maintain the assessed value of $26,000.00 on the tanks of Plaintiff Gano as $26,000.00.

"5. Determine, at a hearing when all parties concerned may be present, after due notice, the average per centage of decrease made in 1953, with respect to assessed valuation and to what class or classes of property such decrease was applied; and then, determine, at

said hearing, the average per centage of increase of assessed valuation made in 1958 and to what class or classes of property such increase was applied; and if, at such, hearing the board determines that the decreases were generally applied to all classes of property in 1953 and the increases unilateraly [sic] applied to Plaintiff's properties alone, (or to elevators as a class) in 1958, to then reduce Plaintiff's assessed valuation to the same per centage as all other classes are being assessed in 1958, in relation to the values as fixed in 1952, on the Baca County tax rolls and thereafter make refund to Plaintiffs the excess of such taxes paid by Plaintiffs and each of them, after having made such determination; provided, however, if said board shall determine that the 1953 decreases and 1958 increases were unilateraly [sic] applied to elevators as a class; or that the 1953 decreases and 1958 increases were uniformly applied to all classes of property, then in that event, to hold the 1958 assessment valid and make no further adjustment, excepting those adjustments specifically ordered herein above in paragraphs (d) (1) and (2).

"6. Report to this Court within 30 days after receipt of this order by the board, its determination, as ordered, in order that the Court may make such findings as necessary with respect to costs, etc."

On February 24, 1960, hearing was had before the board. There it was proved that Hiram Burton, assessor of Baca County in 1953, pursuant to orders of the Colorado Tax Commission, for the year 1953 reduced the assessed valuations of all Baca County grain storage elevators twenty-five percent.

It was also proved that Jimmy Patterson, assessor of Baca County in 1958, pursuant to orders of the Colorado Tax Commission, for the year 1958 increased the assessed valuations of all elevators in Baca County by twenty-five percent. No properties other than elevators were subjected to this decrease or increase. Both were the handiwork of the Colorado State Tax Commission.

Drought conditions prompted the decrease and rainfall prompted the increase.

The board, on March 1, 1960, entered its FINDINGS OF FACT AND ORDER complying with paragraphs 1, 2, 3 and 4 of the court's order, supra, and further found that in 1958 all grain elevator assessments were increased twenty-five percent and that no other properties were subjected to these changes.

The board entered the following further order:

"V. The Board of Equalization of Baca County orders that the 1958 tax assessment of elevator properties owned by the plaintiffs be recognized as valid and that no adjustment be made in the assessed values, except as ordered by this Board of Equalization in Paragraphs I, II and III [and IV — no doubt omitted through oversight]."

This order was forwarded to the trial court as directed and made a part of the case then pending before the trial court. Bartlett and Gano, on March 16, 1960, filed objections to the order, claiming, among other things, that the Board, being a party to the litigation, could not act as a finder of facts in a case to which it was a party; further, that there has been no valid assessment of the subject properties, and urged that the trial court reopen the case, hear evidence, and enter a decision.

On December 27, 1960, these objections were overruled and the court ordered:

" * * * that Plaintiffs' objections to the Board's Findings of Fact and Order be, and they are hereby, denied, and that the assessment as made therein is hereby adopted, approved and confirmed by this Court."

Plaintiffs are here by writ of error, seeking reversal and remand with directions that the assessor be required to value and assess the properties on the basis of the 1957 assessments, without increase, or, in the alternative, remand the case to the district court with instructions to follow statutory provisions as well as cause the assessor to make an assessment in accordance with his

judgment and not the judgment of the State Tax Commission.

The assessment, levy and collection of ad valorem taxes is exclusively a legislative function and is to be exercised pursuant to general laws, subject only to limitations imposed by the Constitution of the State of Colorado and the Constitution of the United States.

In *City and County of Denver v. Lewin,* 106 Colo. 331, 105 P. (2d) 854, this court said:

" 'The taxing power of the state is exclusively a legislative function, and taxes can be imposed only in pursuance of legislative authority, there being no such thing as taxation by implication. Subject to the fundamental or organic limitations on the power of the state, the legislature has plenary power on the matter of taxation, and it alone has the right and discretion to determine all questions of time, method, nature, purpose, and extent in respect of the imposition of taxes, the subjects on which the power may be exercised, and all the incidents pertaining to the proceedings from beginning to end; and the exercise of such discretion, within constitutional limitations, is not subject to judicial control. * * * .' 61 C. J., pp. 81-83, §10."

See, also, *Stanley v. Little Pittsburg Mining Co.,* 6 Colo. 415.

Pertinent constitutional limitations on the power of the legislature in force in 1958 are found in Article X, Section 3 (as amended November 6, 1956, L. 1957, page 796 — 1960 Perm. Supp. C.R.S., Article X, Section 3):

"*Uniform taxation — exemptions.* —All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax, and shall be levied, assessed, and collected under general laws, which shall prescribe such methods and regulations as shall secure just and equalized valuations for assessments of taxes upon all property, real and personal, located within the territorial limits of the authority levying the tax; * * *."

and in Article X, Section 15 (as amended November 3, 1914, L. 1915, p. 163):

"*Board of equalization — duties.* — There shall be a board of equalization for the state, * * * . The duty of the said board of equalization shall be to adjust, equalize, raise or lower the valuation of real and personal property of the several counties of the state, and the valuation of any item or items of the various classes of such property.

"There shall be in each county of this state a county board of equalization * * * . The duty of the county board of equalization shall be to adjust, equalize, raise or lower the valuation of real and personal property within their respective counties, subject to revision, change and amendment by the state board of equalization. *The state board of equalization and the county board of equalization shall equalize to the end that all taxable property in the state shall be assessed at its full cash value* and also perform such other duties as may be prescribed by law; provided, however, that the state board of equalization shall have no power of original assessment." (Emphasis supplied.)

In *People v. Pitcher,* 61 Colo. 149, 156 Pac. 812, the court said:

" * * * The office of County Assessor in each county was created by the Constitution, but the duties thereof were prescribed by legislative acts. * * * ."

See, also, *Weidenhaft v. Commissioners,* 131 Colo. 432, 283 P. (2d) 164.

In *Citizens' Committee v. Warner,* 127 Colo. 121, 254 P. (2d) 1005, this court said:

"It not only is the duty of the assessor to see to it that all property within his county is returned for tax assessment, and to finally fix the valuation upon each item for that purpose, but he further is obligated to undertake, so far as within his power and judgment, to see to it that taxes shall be uniformly assessed within his county. 'All taxes shall be uniform upon the same

class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal;' Section 3, Article X, Colorado Constitution."

■ There, it is expressly stated that the assessor has specific duties to perform in conformity with legislative directives and that in performing these duties he, as well as others, shall comply with the very general admonitions in Article X, Section 3 of the Colorado Constitution with the ultimate goal of securing "just and equalized valuations."

The duty of listing and valuing all taxable property devolves upon the assessor, and he alone.

The State Constitution, Article X, Section 15, expressly states that: " * * * the state board of equalization shall have no power of original assessment."

The Eighteenth General Assembly, effective June 2, 1911, created the Colorado Tax Commission and defined its duties and powers. The Nineteenth General Assembly, effective May 1, 1913, delegated to the Colorado Tax Commission:

*"Powers conferred on tax commission.* — All statutory powers, duties and privileges heretofore exercised by the state board of equalization are hereby conferred upon the Colorado tax commission and in addition thereto it shall be the duty of the Colorado tax commission to exercise all powers of original assessment of all public utility corporations." — C.R.S. '53, 137-6-11.

In *Bohen v. Commissioners,* 109 Colo. 283, 124 P. (2d) 606, this court said:

" * * * It thus appears the question presented is, Can the Tax Commission or the Board of Equalization, under the facts here, make an original assessment of the property of an individual taxpayer or order the assessor to do so, or is the sole authority in such case vested in the assessor, subject only, in absence of fraud

or similar invalidity, to review by the county commissioners sitting as a board of equalization? Incidentally also the capacity of plaintiffs to sue, the propriety of mandamus as a remedy, and the availability of that remedy to the Climax Company are discussed.

"The Tax Commission claims to have acted under section 175, chapter 142, '35 C.S.A. That section does not support it and such of its language as seems to do so is directly negatived by the limitation on its remedial action to a per cent increase or decrease 'in the valuation in such county.' We have held that the Tax Commission is so limited, and that as to classes of property and omissions from the rolls its authority ends when the county board acts. *First Nat. Bank v. Patterson*, 65 Colo. 166, 174, 176 Pac. 498; *People ex rel. v. Pitcher*, 56 Colo. 343, 138 Pac. 509.

"If the Board of Equalization is authorized to make original assessments, or order the raising or lowering thereof, or direct the assessor to do so, it must be by virtue of some provision of section 177, chapter 142, '35 C.S.A. However, such authority is not therein specifically conferred and we have held that it does not exist. *Board of Commissioners v. Union Pac. R. R. Co.*, 89 Colo. 110, 299 Pac. 1055; *In Re Questions of the Governor*, 55 Colo. 17, 123 Pac. 660; *Union Pac. R. R. Co. v. Commissioners*, 35 F. (2d) 785, 790."

Counsel for plaintiffs contend that the 1958 assessments are void, having been made by the Tax Commissioner rather than the assessor. From the record it clearly appears that the State Tax Commission took a lively and unseemly interest in the performance by the assessor of his exclusive duty of placing values on plaintiffs' properties; however, we do not agree that the assessor in taking the 1957 valuations with certain deductions for depreciation was acting under the control and direction of the Tax Commission. Those figures of valuation were those of the assessor, even though predicated

on the 1941 reconstruction costs as computed by Winkleman in 1952, pursuant to Manual "procedures."

In *Northcutt v. Burton,* 127 Colo. 145, 254 P. (2d) 1013, this court said:

"Where, however, the tax is illegally laid or, because of some unlawful act of the authorities is erroneous in its entirety, requiring not adjustment but refund, a demand for which is denied, pursuant to section 281 suit may be brought to compel proper reimbursement. The term 'erroneous assessment' as used in this section, implies more than mere over-assessment and refers to a tax levy that for any reason is wholly illegal or invalid. *First National Bank of Greeley v. Patterson,* 65 Colo. 166, 174, 176 Pac. 498, 501; *South Broadway National Bank v. Denver,* 51 F. (2d) 703, 705."

In *Weidenhaft v. Commissioners,* 131 Colo. 432, 283 P. (2d) 164, this court said:

"Counsel further objects, however, to the methods of the Commission by insisting that its direction to the county assessor in El Paso county was a usurpation of his authority and the dictation of its judgment of property values rather than leaving such to the assessor. The record in this case does not bear out such contention. It is true that the Commission issued a pricing manual and various other data and forms which the assessor was directed to use, but these were designed only for the aid and assistance of the assessor and as standards by which he could more accurately appraise the property under his jurisdiction. In effect these directives simply gave the technical steps necessary to make an accurate valuation appraisal. They contain every possible situation that one can think of that could confront an assessor or appraiser in determining a fair valuation, including not only types of buildings, but also depreciation, obsolescence, locality, proximity to lower-class construction, and all manner of things which should enable a competent appraiser to determine a real and fair evaluation rather than a mere estimate or guess.

The assessors were directed to make assessment at full cash value. The materials furnished them, according to the order of the Commission, were 'to implement assessment procedures by prescribing standards of assessment and methods and forms.' This was the extent of the dictation. The assessment actually was made by the assessor and the officers under his supervision and direction, by and with the assistance of representatives from the Tax Commission's office. * * * ."

Here, we do not have a situation involving taxes levied against property exempt from taxation, double assessments or other factors rendering the whole of the 1958 assessments and taxes levied void.

■ However, with reference to the addition of twenty-five percent onto the values arrived at by the assessor, we have a different situation. The record clearly shows that the increase was not the voluntary act of the assessor. Prior to making the increase the assessor had valued the properties. The increases were not the handiwork of the assessor. He entered the increases "on the request of The Colorado State Tax Commission." It is thus clear that that part of the valuations sought to be reviewed are not the assessor's figures, but those of the Commission, which has no power to assess.

It is true that the Commission has wide powers of supervision, though not as wide as this record indicates it ascribes to itself.

*After an assessment has been made,* it can, pursuant to 137-6-12 (6), make a reappraisal of property, (7) raise or lower the assessed value of any property on notice and hearing to interested parties.

The Commission did not take either of these steps. Hence, its action in increasing the assessor's values by twenty-five percent is without authority and void.

We find nothing in the constitution, statutes or decisions of this court to warrant the ruling of the trial court adopting and approving the assessments, including the twenty-five percent increase.

■ Findings and Conclusions of the trial judge indicate that he did not find justification for his ultimate conclusion within the constitution, statutes or court decisions. In fact the judgment, affirming the Board's conclusion entered pursuant to the directions of the trial court, is predicated entirely on what the court found to be "the standard in Baca County and generally throughout the entire state." Thus, it appears that the trial court found justification for the assessments in customs and standards then prevalent in Baca County and generally in Colorado.

Insofar as these customs or standards are not in conformity with law, they must give way to the law to the end that lawful, rather than customary, assessments be made.

The judgment is reversed and the cause remanded to the trial court with directions to order the assessor to value and assess the subject properties for the year 1958 according to law and not inconsistent with the views herein expressed, and to make the deletion, addition and modification ordered by the trial court in paragraph VII, 1, 2 and 3 of its Findings of Fact and Conclusions of Law, entered January 25, 1960, the assessor to report to the trial court the assessments so made; whereupon the trial court enter a proper judgment based upon said assessments granting to Bartlett and Gano proper relief as provided under C.R.S. '53, 137-3-38.