Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2017 CO 72**

**No. 15SC595, <u>Kinder Morgan CO$_2$ Co., L.P. v. Montezuma Cty. Bd. of Comm'rs</u>—Oil and Gas—Property Taxation—Statutory Construction.**

The supreme court reviews the court of appeals' conclusion that the Montezuma County Assessor had statutory authority to retroactively assess property taxes on oil and gas leaseholds operated by Kinder Morgan, after the assessor determined that Kinder Morgan had underreported the wellhead selling price of CO$_2$ gas produced at the leaseholds. The supreme court considers whether this assessment was authorized under the statute permitting retroactive property tax assessments when "taxable property has been omitted from the assessment roll," § 39-5-125(1), C.R.S. (2016). Given Colorado's self-reporting scheme for property taxation of oil and gas leaseholds and the legislature's amendments to that scheme—which describe the "underreporting of the selling price or the quantity of oil and gas sold [from a leasehold]" as a form of omitted property, §§ 29-1-301(1), 39-10-107(1), C.R.S. (2016)—the supreme court concludes that the assessor had statutory authority to issue the assessment in this case. The supreme court further concludes that the Board of Assessment Appeals did not err in determining that Kinder Morgan had underreported the wellhead selling price of CO$_2$. The supreme court therefore affirms the judgment of the court of appeals.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2017 CO 72

### Supreme Court Case No. 15SC595
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA2187

### Petitioner:

Kinder Morgan $CO_2$ Co., L.P.,

v.

### Respondents:

Montezuma County Board of Commissioners; Colorado Board of Assessment Appeals; and Colorado Property Tax Administrator.

### Judgment Affirmed
*en banc*
June 19, 2017

**Attorneys for Petitioner:**
The Poe Law Office LLC
Alan Poe
Rachel Poe
  *Centennial, Colorado*

**Attorneys for Respondent Montezuma County Board of Commissioners:**
Dufford, Waldeck, Milburn & Krohn, L.L.P.
Nathan A. Keever
  *Grand Junction, Colorado*

**Attorneys for Respondent Colorado Property Tax Administrator:**
Cynthia H. Coffman, Attorney General
Frederick R. Yarger, Solicitor General
Robert H. Dodd, Senior Assistant Attorney General
  *Denver, Colorado*

No appearance on behalf of Respondent Colorado Board of Assessment Appeals.

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

¶1    The petitioner in this case, Kinder Morgan CO$_2$ Company, L.P., operates oil and gas leaseholds in Montezuma County, Colorado. In 2009, the assessor for Montezuma County issued a corrective tax assessment on these leaseholds for the previous tax year, retroactively assessing over $2 million in property taxes, after an auditor concluded that Kinder Morgan underreported the value of gas produced at the leaseholds. Kinder Morgan contends that the assessor lacked authority to retroactively assess these taxes because the statutory scheme for property taxation of oil and gas leaseholds—which authorizes retroactive assessments when "taxable property has been omitted from the assessment roll," § 39-5-125(1), C.R.S. (2016)—does not authorize a retroactive assessment when an operator has correctly reported the volume of oil and gas sold but has underreported the selling price at the wellhead. We are therefore asked to decide whether this statutory scheme authorizes retroactive taxation where an operator underreports the selling price at the wellhead of the oil and gas it produces.

¶2    Because Colorado has established a self-reporting scheme for property taxation of oil and gas leaseholds, and because the legislature's amendments to that scheme describe the "underreporting of the selling price or the quantity of oil and gas sold [from a leasehold]" as a form of omitted property, see §§ 29-1-301(1), 39-10-107(1), C.R.S. (2016), we conclude that the statutory scheme authorized the retroactive tax assessment in this case. We further conclude that the Board of Assessment Appeals did not err in determining that Kinder Morgan underreported the selling price by claiming excess transportation deductions, given Kinder Morgan's relationship to the owner of

2

the pipeline through which the gas was transported. We therefore affirm the judgment of the court of appeals.

## I. Property Taxation of Oil and Gas Leaseholds

¶3 Because this case concerns the assessment of property taxes on oil and gas leaseholds, we begin by describing the legal framework governing these taxes and the relation of these taxes to other pertinent forms of taxation.

¶4 An estate in minerals such as oil and gas is a form of real property. § 24-65.5-101, C.R.S. (2016); § 39-1-102(14), C.R.S. (2016); see Hagood v. Heckers, 513 P.2d 208, 214 (Colo. 1973); Simson v. Langholf, 293 P.2d 302, 307 (Colo. 1956). Once the owner of such a mineral estate leases the right to extract oil and gas from the land, the lease may create various interests, which generally take the form of either a working interest (the oil and gas company's right to extract the minerals and develop them for profit) or a royalty interest (the estate owner's right to receive a share of the production or a share of the value of proceeds of production). See generally 1 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers, Oil and Gas Law §§ 201–216 (2014 ed.). Oil and gas leaseholds are subject to taxation as real property.[1] § 39-7-102, C.R.S. (2016); Colo. Const. art. X, § 3(1)(b). Unlike most real property interests, however, the value of an oil and gas leasehold interest comes not from the physical space or land the leasehold occupies, but

---

[1] Oil and gas leaseholds are also subject to severance taxes, which are "a special excise tax . . . on the nonrenewable natural resources removed from the soil of this state and sold for private profit." § 39-29-101(1), C.R.S. (2016). Severance taxes are assessed because "when nonrenewable natural resources are removed from the earth, the value of such resources to the state of Colorado is irretrievably lost." Id.; see also BP Am. Prod. Co. v. Colo. Dep't of Revenue, 2016 CO 23, ¶ 11, 369 P.3d 281, 284.

rather, from the quantity and value of oil and gas underground. See <u>Washington Cty. Bd. of Equalization v. Petron Dev. Co.</u>, 109 P.3d 146, 150–51 (citing Colo. Const. art. X, § 3(1)(b)).

¶5 The legislature has plenary authority to assess, levy, and collect taxes, including taxes on real property. <u>Bd. of Cty. Comm'rs v. Vail Assocs., Inc.</u>, 19 P.3d 1263, 1273 (Colo. 2001). Nevertheless, the legislature's authority to tax is circumscribed by article X of the Colorado Constitution. <u>Id.</u> (citing <u>Bartlett & Co., Grain v. Bd. of Cty. Comm'rs of Baca Cty.</u>, 382 P.2d 193 (Colo. 1963)). As relevant to this case, section 3 of article X limits the legislature's ability to assess property taxes by requiring that taxes be based on the "actual value" of the property. <u>Petron Dev. Co.</u>, 109 P.3d at 149; <u>see also</u> <u>San Miguel Cty. Bd. of Equalization v. Telluride Co.</u>, 947 P.2d 1381, 1383 (Colo. 1997) ("[A]ctual value is the guiding principle for the taxation of real property in Colorado.").

¶6 The legislature also has the authority to prescribe appropriate methods for determining the "actual value" of property. See <u>Petron Dev. Co.</u>, 109 P.3d at 149. For most types of real property, the legislature has required the county assessor to consider and document three approaches to determine the "actual value" of the property: the cost approach, the market approach, and the income approach.[2] § 39-1-103(5)(a), C.R.S (2016).

---

[2] The cost approach values property by estimating the cost of replacing improvements to a property; the market approach values property by considering sales of comparable properties in the market; and the income approach considers the income stream a property is capable of generating, capitalized to value at a rate typical within the

¶7     By contrast, oil and gas leaseholds and lands are valued under the provisions of article 7 of title 39.  § 39-1-103(2).  Under the provisions of article 7, the holder of an oil and gas lease must submit an annual statement, from which the county assessor determines the property's value and the leaseholder's property tax liability.  See §§ 39-7-101, -102.  The annual statement must include, among other information, the volume of gas or oil sold and the selling price of the gas or oil "at the wellhead"—a term that refers to "the physical location where the extracted material emerges from the ground."  § 39-7-101(1)(c)–(d); Petron Dev. Co., 109 P.3d at 153.

¶8     The sale of unprocessed oil or gas, however, rarely occurs at the wellhead; instead, the oil or gas is typically gathered from multiple wells, processed, and transported away from the wellsite before sale.  See Petron Dev. Co., 109 P.3d at 151–54.  As a result, an operator typically must estimate its "selling price at the wellhead" for purposes of section 39-7-101(1)(d) by deducting from its final, downstream selling price the costs of gathering, processing, and transporting the extracted material.  Id. at 153–54; § 39-7-101(1)(d) ("The net taxable revenues shall be equal to the gross lease revenues, minus deductions for gathering, transportation, manufacturing, and processing costs borne by the taxpayer pursuant to guidelines established by the [Property Tax Administrator].").  This calculation—that is, the deduction of gathering, processing, and transportation costs from the final, downstream selling price—is known

relevant market.  Bd. of Assessment Appeals v. E.E. Sonnenberg & Sons, Inc., 797 P.2d 27, 30–31 nn.8, 9 & 12 (Colo. 1990).

5

as a "netback" method of calculating wellhead selling price. <u>Petron Dev. Co.</u>, 109 P.3d at 152.

¶9     An operator's netback calculation depends on whether the operator contracts with a related or an unrelated party to perform these gathering, processing, and transportation services. If the operator enters into a bona fide, arm's-length transaction with an unrelated party to perform these services, then the operator may deduct the full amount paid for these services from its final, downstream sales price in its netback calculation (the "unrelated-parties netback method"). <u>See</u> 3 Div. of Prop. Taxation, Colo. Dep't of Local Affairs, <u>Assessor's Reference Library: Real Property Valuation Manual</u> ("ARL") 6.35–6.36 (Rev. Jan. 2017). If the operator instead enters into a transaction with a related party (such as another subsidiary of the same parent company) to perform these services, then it may deduct only a portion of the amount paid for these services (the "related-parties netback method").[3] 3 ARL 6.39–6.41. The operator need not disclose the methodology or details of its netback calculation in its annual statement, <u>see</u> § 39-7-101(1)(a)–(f), although an assessor may elect to require this information to be submitted separately, and the assessor may rely on this information if it conducts a review or an audit, <u>see</u> 3 ARL 6.34–6.35.

¶10     Section 39-2-109(1)(k), C.R.S. (2016), requires the Property Tax Administrator to prepare and publish guidelines providing procedures for county assessors to audit oil

---

[3] Specifically, the operator may deduct the allowable direct costs incurred in gathering, processing, and transportation, as well as amounts representing the return on investment ("ROI") and return of investment ("RofI") on the improvements and equipment used for gathering, processing, and transportation. 3 ARL 6.40.

and gas leaseholds for property tax purposes, which the Administrator has done in the Assessor's Reference Library. Under these guidelines, an assessor may initiate an audit and request the source documents regarding sales volume and sales price from which the operator prepared its annual statement. 3 ARL 6.52. The assessor then determines whether a change in the property's valuation is warranted and may issue a corrective assessment or an abatement. Id. at 6.53–6.58. The guidelines state that retroactive assessments are authorized under the statutes providing for assessments on property that has been previously "omitted from the assessment roll" and that abatements are authorized under the statutory provision allowing for refunds and abatements if taxes have been "illegally or erroneously levied and collected." See id. at 6.55 (citing § 39-10-107), 6.58 (citing § 39-10-114).

¶11 With this legal framework in mind, we turn to the facts of this case.

## II. Facts and Procedural History

¶12 Kinder Morgan $CO_2$ Company, L.P., produces, transports, and sells carbon dioxide ($CO_2$) for use in oil and gas operations. Kinder Morgan is the operator of the McElmo Dome Unit,[4] a large $CO_2$ deposit in Montezuma County and Dolores County, near the Four Corners area of Colorado. The $CO_2$ extracted from the McElmo Dome

---

[4] In the oil and gas context, a "unit" is a consolidation of working interests that extract resources from a single geological reservoir. Units are created for the purpose of efficiently extracting resources from the reservoir through coordinated engineering and operation, often by a single operator. See 6 Patrick H. Martin & Bruce M. Kramer, Williams & Meyers, Oil and Gas Law § 901 (2014 ed.). The Colorado Oil and Gas Conservation Commission ("COGCC") approved the unitization of the McElmo Dome working interests in 1982. COGCC Order No. 389-1 (Nov. 17, 1982).

Unit is compressed and transported through the Cortez Pipeline across New Mexico and into West Texas. There, the $CO_2$ is sold to various oil and gas operators, who inject the $CO_2$ into existing West Texas oil fields to enhance oil recovery.

¶13    In addition to Kinder Morgan, several other companies and individuals own working interest leaseholds and royalty interests in the unit. As the operator of the unit, Kinder Morgan manages the unit's development by paying for the facilities and equipment and supplying the labor to produce $CO_2$, which the various working interest leaseholders own in proportion to the relative sizes of their leaseholds. Kinder Morgan then bills the other working interest leaseholders for its expenses in operating the unit and arranging for transportation of the $CO_2$ to the point of sale. As the operator, Kinder Morgan also files annual property tax statements for all of the leaseholds.

¶14    The Cortez Pipeline—through which the $CO_2$ is shipped—is owned by Cortez Pipeline Company and operated by Kinder Morgan. Cortez Pipeline Company, in turn, is a partnership. At the time of the disputed tax assessment, Kinder Morgan owned a 50% interest in Cortez Pipeline Company. The remaining interest in the partnership was owned by Mobil Cortez Pipeline Company (37%) and Cortez Vickers Pipeline Company (13%). Cortez Pipeline Company charges the same, fixed tariff to any entity that ships $CO_2$ through the pipeline. In 2007, that tariff was 22 cents per MCF[5] of $CO_2$.

¶15    When Kinder Morgan submitted its annual property tax statement for the 2008 tax year, it reported a wellhead selling price of 52 cents per MCF. Kinder Morgan

---

[5] An MCF is a common pricing unit for gas, representing one thousand cubic feet of gas. See, e.g., § 34-60-118.5(2.3)(d), C.R.S. (2016).

8

calculated that wellhead selling price using the unrelated-parties netback methodology, under which Kinder Morgan deducted (among other costs) the full 22-cent transportation tariff it paid to Cortez Pipeline Company. Based on Kinder Morgan's annual statement, the assessor valued the Montezuma County leaseholds at approximately $157.5 million and assessed property taxes accordingly.

¶16 Following an audit of Kinder Morgan's property taxes for the 2008 tax year, the assessor increased its valuation of the leaseholds by $57 million, largely based on the auditor's discovery of Kinder Morgan's 50% partnership interest in Cortez Pipeline Company. The auditor concluded that Kinder Morgan and Cortez Pipeline Company were "related parties," and that under the related-parties netback methodology, Kinder Morgan could deduct only a portion of the 22-cent transportation tariff when calculating its wellhead selling price. Under the auditor's revised valuation, Kinder Morgan's tax liability increased by over $2 million.[6]

¶17 Based on this audit, the assessor issued Special Notices of Valuation to Kinder Morgan, assessing the additional $2 million in property taxes in light of the revised valuation. Kinder Morgan paid the taxes under protest and later filed petitions for abatement, seeking refunds of the retroactively increased taxes. Those petitions argued, in relevant part, that the assessor lacked authority to issue the Special Notices of Valuation because no property had been "omitted" from Kinder Morgan's annual statement, and as a result, the retroactive assessment was not authorized under section

---

[6] The exact increase in Kinder Morgan's property tax liability was $2,028,865.82.

9

39-5-125, which permits retroactive assessment when "taxable property has been omitted from the assessment roll." Kinder Morgan further argued that even if the assessor had authority to retroactively assess these taxes, the retroactive assessment was erroneous because Kinder Morgan was entitled to deduct the full 22-cent transportation tariff in calculating its wellhead selling price. The Montezuma County Board of Commissioners denied the petitions.

¶18 Kinder Morgan appealed to the Colorado Board of Assessment Appeals. After a two-day hearing, in which Kinder Morgan and the Montezuma County Board of Commissioners presented witnesses and documentary evidence, the Board of Assessment Appeals affirmed. The Board of Assessment Appeals concluded that the Montezuma County Assessor had authority to issue the retroactive assessment under the audit guidelines of the Assessor's Reference Library. The Board of Assessment Appeals further concluded that Kinder Morgan and Cortez Pipeline Company were "related parties," meaning that the auditor had properly concluded that Kinder Morgan was not entitled to deduct the full 22-cent tariff in its netback calculation.

¶19 Kinder Morgan then appealed the Board of Assessment Appeals' decision to the court of appeals, which likewise affirmed. In a published opinion, the court of appeals agreed that the Montezuma County Assessor had statutory authority to issue the disputed assessment, concluding that House Bill 90-1018 "amended the property tax code to authorize retroactive property tax assessments on the value of oil and gas leaseholds and lands omitted due to underreporting of the selling price or quantity of oil and gas sold therefrom." Kinder Morgan $CO_2$ Co., L.P. v. Montezuma Cty. Bd. of

10

Comm'rs, 2015 COA 72, ¶ 36, ___ P.3d ___. The court of appeals further concluded that competent evidence supported the Board of Assessment Appeals' determination that Kinder Morgan and Cortez Pipeline Company were "related parties" for purposes of calculating the transportation deduction, given Kinder Morgan's partnership interest in Cortez Pipeline Company. Id. at ¶¶ 41–43.

¶20 We granted Kinder Morgan's petition for writ of certiorari to review the court of appeals' ruling,[7] and now affirm.

## III. Analysis

¶21 We first consider whether the statutory scheme governing property taxation of oil and gas leaseholds authorizes retroactive assessments when a leaseholder has correctly reported the volume of oil or gas sold but has underreported the wellhead selling price of the oil or gas. We conclude that the statutory scheme authorizes these retroactive assessments, given the self-reporting scheme for property taxation in this context and the legislature's amendments to that scheme, which describe the "underreporting of the selling price or the quantity of oil and gas sold [from a leasehold]" as a form of omitted property.

---

[7] We granted certiorari on the following issues:

1. Whether the court of appeals properly concluded that House Bill 90-1018 amended section 39-10-107(1), C.R.S. (2016), to permit retroactive assessment of property taxes on the value of oil and gas leaseholds omitted due to the underreporting of the selling price of oil and gas or the quantity sold therefrom.

2. Whether the court of appeals applied the proper standard of review of the Board of Assessment Appeals' (BAA's) determination that Kinder Morgan and Cortez Pipeline Company are "related parties."

¶22 We next consider whether the Board of Assessment Appeals erred in concluding that Kinder Morgan was not entitled to deduct the full price paid for transportation of gas because Kinder Morgan and Cortez Pipeline Company are "related parties." Given Kinder Morgan's 50% partnership interest in Cortez Pipeline Company, we conclude that the Board of Assessment Appeals did not err in determining that Kinder Morgan and Cortez Pipeline Companies are "related parties," and therefore, that Kinder Morgan was not entitled to deduct these full amounts.

## A. Retroactive Tax Assessment for Oil and Gas Property

### 1. Standard of Review

¶23 We review questions of statutory interpretation de novo. BP Am. Prod. Co. v. Colo. Dep't of Revenue, 2016 CO 23, ¶ 9, 369 P.3d 281, 284.

### 2. Statutory Interpretation

¶24 Our primary task in construing a statute is to effectuate the intent of the General Assembly. Id. at ¶ 15, 369 P.3d at 285. We construe statutes related to the same subject matter alongside one another, with the goal of giving consistent, harmonious, and sensible effect to all of their parts. Yuma Cty. Bd. of Equalization v. Cabot Petroleum Corp. ("Cabot II"), 856 P.2d 844, 849 (Colo. 1993). We strive to avoid statutory interpretations that render certain words or provisions superfluous or ineffective. See Welby Gardens v. Adams Cty. Bd. of Equalization, 71 P.3d 992, 995 (Colo. 2003).

¶25 Applying these principles of construction to the statutory scheme governing property taxation of oil and gas leaseholds, we conclude that it authorizes retroactive tax assessments when an operator underreports the selling price or volume of oil and

12

gas. Two statutory provisions provide the authority for an assessor to retroactively assess taxes on "omitted property."[8] First, under section 39-5-125, "whenever it is discovered that <u>any taxable property has been omitted from the assessment roll</u> of any year or series of years, the assessor shall immediately determine the value of such omitted property and shall list the same on the assessment roll of the year in which the discovery was made." § 39-5-125(1) (emphasis added). Second, section 39-10-101 provides that if "the treasurer discovers that <u>any taxable property then located in the</u> <u>treasurer's county has been omitted from the tax list and warrant</u> for the current year or for any prior year . . . , the treasurer shall forthwith list and value such property for assessment in the same manner as the assessor might have done." § 39-10-101(2)(a)(I) (emphasis added).

¶26 Here, we are asked to decide whether an operator's underreporting of the value of oil and gas produced at a leasehold constitutes "omitted property" subject to a corrective assessment under section 39-5-125. Two aspects of the statutory scheme inform our answer to this question: the legislature's amendments to the statutory scheme and the self-reporting procedure for valuation of oil and gas leaseholds in Colorado.

¶27 In 1990, the legislature approved House Bill 90-1018, which, as relevant here, amended the statutory scheme governing oil and gas taxation in two ways that

---

[8] In addition, under section 39-7-105, C.R.S. (2016), an assessor may re-value and re-assess taxes on an oil and gas leasehold if any part of the leaseholder's annual statement is "willfully false or misleading." <u>See, e.g.</u>, <u>Cabot II</u>, 856 P.2d at 849. Section 39-7-105 is not at issue in this case.

13

demonstrate the legislature's intent to treat the underreporting of the selling price of gas sold from a leasehold as a form of omitted property. First, the bill amended section 29-1-301 to provide that certain "revenues" would not count towards a taxing entity's levy limit[9]—namely, "revenues received as taxes paid on oil and gas leaseholds and lands that had been previously <u>omitted from the assessment roll due to underreporting of the selling price</u> or the quantity of oil or gas sold therefrom." Ch. 277, sec. 39, § 29-1-301(1), 1990 Colo. Sess. Laws 1687, 1704 (emphasis added). Second, the bill amended section 39-10-107 to provide that certain "taxes" would be excepted from a general rule about the time for apportioning, crediting, and distributing taxes—namely, "any prior years' taxes collected during any given year on oil and gas leaseholds and lands which had previously been <u>omitted from the assessment roll due to underreporting of the selling price</u> or the quantity of oil and gas sold therefrom." Ch. 277, sec. 40, § 39-10-107(1), 1990 Colo. Sess. Laws 1687, 1704–05 (emphasis added).

¶28 These amendments demonstrate the legislature's intent to treat the underreporting of the selling price of oil and gas as omitted property under the statutory scheme governing oil and gas taxation. That is, by providing special procedures for handling taxes that had been retroactively assessed based on underreported selling price or volume, the legislature necessarily intended for such taxes to be retroactively assessed. Indeed, by exempting these retroactive assessments

[9] Subject to certain exceptions and qualifications, section 29-1-301, C.R.S. (2016), provides a limit on the amount of taxes that a taxing entity may levy by prohibiting "the levying of a greater amount of revenue than was levied in the preceding year plus five and one-half percent." § 29-1-301(1)(a).

from the taxing entity's levy limit, the 1990 amendments removed a potential obstacle that otherwise might have prevented taxing entities from collecting these taxes. See § 29-1-301(1)(a).

¶29 Our conclusion that underreporting of the selling price constitutes the type of error or omission that falls within the reach of the "omitted property" statutes comports with the overarching statutory scheme governing property taxation of oil and gas leaseholds. The value of an oil and gas leasehold is derived from the volume and selling price of the oil and gas. That is, if a leasehold produces no oil or gas that is then sold for value, then no property taxes are assessed. See, e.g., 3 ARL 6.50 ("If . . . there was no production from [a leasehold] during the previous calendar year, no value is assigned."). And if a taxpayer underreports the volume or selling price of oil and gas produced, the assessor does not have the opportunity to value the volume of the oil and gas or the portion of the selling price that was not reported.

¶30 Moreover, given the statutory timeline and framework for property tax assessments in this context, the assessor must be able to issue corrective assessments to avoid under-taxation. The operator's annual statement is due on April 15. § 39-7-101(1). Based on the information reported in that annual statement, the assessor has a limited period of time — until June 15 — to value the property and issue a notice of valuation. § 39-7-102.5, C.R.S. (2016); § 39-5-121(1.5)(a)(I), C.R.S. (2016). During this two-month period, the assessor relies on information that is self-reported by the operator, typically without the means to independently verify the volume and value of

oil and gas produced at the leasehold.[10] This situation differs from the valuation methods for other forms of real property, in which the assessor identifies taxable property and calculates a taxable value based on widely available information. See § 39-1-103(5)(a).

¶31 Given that the assessor relies on taxpayer-reported information to initially value the property during this period, any error in valuation typically will result not from the assessor's mistake in calculating the taxable value, but rather, from the taxpayer's failure to accurately report information about the leasehold as required by statute. Cf. Cabot II, 856 P.2d at 846–49 (concluding that Yuma County had authority to retroactively assess property taxes, where "Cabot knew that it was not accurately reporting the selling price [of its natural gas] when it filed annual statements"). Accordingly, the assessor must be able to issue corrective assessments to avoid under-taxation caused by an operator's errors in reporting—errors that, because of the statutory timeline for the valuation process, the assessor has no means of correcting at an earlier stage.

¶32 Finally, the fact that the statutory scheme governing property taxation of oil and gas leaseholds includes audit provisions further confirms the authority to issue retroactive assessments if an operator has underreported the selling price of oil or gas.

---

[10] Although an assessor could initiate an audit, as a practical matter, it is unlikely that the audit process could be concluded within this two-month period: the audit can commence no sooner than fifteen days after the taxpayer receives notice of the audit, and the taxpayer has thirty days after receipt of the preliminary audit findings to submit additional information not considered by the county, which the assessor must then consider before issuing any corrective assessment. See 3 ARL 6.54–6.56.

In 1991, the legislature approved Senate Bill 91-214, which, in relevant part, required the Property Tax Administrator "[t]o prepare and publish guidelines . . . concerning the audit and compliance review of oil and gas leasehold properties for property tax purposes." Ch. 307, sec. 1, § 39-2-109(1)(k), 1991 Colo. Sess. Laws 1953, 1953. This amendment demonstrates the legislature's intent to impose uniform property tax auditing procedures on oil and gas leaseholds.

¶33 Such an audit scheme would be incomplete if assessors lacked the authority to issue corrective assessments based on the results of their audits. Indeed, the statutory provision governing tax abatements in this context confirms that audits can lead to corrective assessments. That provision requires that, when calculating the amount of the abatement to which the taxpayer is entitled, any taxes due as a result of an audit must be offset against any overpayment of taxes. § 39-10-114(1)(a)(I)(E), C.R.S. (2016) ("[W]hen an audit of prior years' taxes . . . discloses that taxes are due and owing . . . on oil and gas leaseholds, such taxes shall be subtracted from any overpayment of such taxes determined to be due . . . ."). In other words, although the power to audit does not independently authorize retroactive tax assessments, the legislature's inclusion of an audit provision further bolsters our interpretation of the statutory scheme, in which an assessor may issue a corrective assessment if the assessor assigns an inaccurate value to a leasehold because of the assessor's reliance on incorrect, taxpayer-supplied information about the taxable property.

¶34 For these reasons, we conclude that the statutory scheme governing property taxation of oil and gas leaseholds and lands authorizes the retroactive assessment of

17

property taxes when an operator underreports the volume or selling price of the oil and gas it produces.

¶35 Kinder Morgan's arguments in support of its alternative construction of the statutory scheme are unpersuasive. First, Kinder Morgan argues that the court of appeals' 1992 decision in Cabot Petroleum Corp. v. Yuma County Board of Equalization ("Cabot I") establishes that the omitted property statutes authorize retroactive assessments only where taxable properties have been entirely omitted from the tax roll, not where they have been included in the tax roll yet undervalued. 847 P.2d 152 (Colo. App. 1992), rev'd on other grounds, Yuma Cty. Bd. of Equalization v. Cabot Petroleum Corp. ("Cabot II"), 856 P.2d 844 (Colo. 1993). In Cabot I, the court of appeals construed the omitted property statutes, sections 39-5-125 and 39-10-101(2)(a), to "authorize retroactive assessments of additional property taxes only against 'omitted property' and not against 'omitted value.'" 847 P.2d at 155. The court then concluded that the Yuma County Assessor lacked authority to issue the retroactive assessment because, although Cabot had reported a selling price below that which it ultimately received (thereby creating "omitted value"), Cabot had filed annual statements for each one of its oil and gas leasehold interests (leaving no "omitted property"). Id. at 153–55.

¶36 We reversed on other grounds, concluding that the retroactive assessment was authorized by a separate provision, section 39-7-105, which provides that an assessor may re-value and re-assess taxes on an oil and gas leasehold if any part of the leaseholder's annual statement is "willfully false or misleading." Cabot II, 856 P.2d at 848. We concluded that this provision applied because Cabot knowingly reported an

18

inaccurate selling price for its gas when it filed its annual statements. Id. Importantly, in reversing the judgment of the court of appeals, we did not reach the court of appeals' construction of the omitted property statutes. See id. at 848–50.

¶37 Contrary to Kinder Morgan's argument, Cabot I does not compel the conclusion that the omitted property statutes do not authorize retroactive assessments when an operator has underreported the selling price of oil or gas. The court of appeals' construction of the omitted property statutes in Cabot I is not binding on this court. Moreover, Cabot I construed the statutory scheme as applied to assessments made in tax years 1986 through 1988—before the legislature approved House Bill 90-1018. See 847 P.2d at 154. Our task is to construe the statutory scheme as a whole, Cabot II, 856 P.2d at 849, and the amendments of House Bill 90-1018 inform our interpretation of the omitted property statutes by describing the statutory scheme, as a whole, as one in which oil and gas leasehold property may be "omitted . . . due to underreporting of the selling price" of oil or gas. See §§ 29-1-301(1)(a), 39-10-107(1)(b). In short, Cabot I simply did not address the question of statutory interpretation that we consider today.

¶38 Second, Kinder Morgan argues that the statutory language added by House Bill 90-1018 cannot authorize the retroactive assessments in this case because the relevant provisions of House Bill 90-1018 did not amend the omitted property statutes, but instead amended statutes relating to the treatment of revenues under the tax levy limit and revenue distribution laws. However, as described above, our task is to construe the statutory scheme as a whole, Cabot II, 856 P.2d at 849; although House Bill 90-1018 did not amend the omitted property statutes, the provisions of House Bill 90-1018

19

nevertheless inform our understanding of the statutory scheme as a whole because they reflect clear legislative intent to treat the "underreporting of the selling price or the quantity of oil and gas sold [from a leasehold]" as a form of omitted property, see §§ 29-1-301(1)(a), 39-10-107(1)(b).  Moreover, Kinder Morgan's proposed construction—under which underreported sales price would not constitute "omitted property"—would render superfluous both statutory references to property that is "omitted . . . due to underreporting of the selling price," §§ 29-1-301(1)(a), 39-10-107(1)(b).[11]  Because we disfavor constructions that render statutory language superfluous, we decline to adopt such a construction.  See Welby Gardens, 71 P.3d at 995.

¶39    Finally, Kinder Morgan's reading of the statutory scheme would produce inequitable results.  Kinder Morgan contends that if a taxpayer fails to accurately report the value of the oil or gas it sells, thereby causing the assessor to undervalue the taxpayer's leasehold property, the assessor lacks authority to remedy this undervaluation by issuing a corrective assessment.  In such a scenario, the taxpayer would never be taxed on the full value of its leasehold property.  In short, Kinder Morgan's proposed interpretation would produce a tax windfall for the taxpayer—due to the taxpayer's own error—and would contravene the constitutional principle that a

---

[11] Kinder Morgan claims that its interpretation would not render superfluous these statutory references to property that is "omitted . . . due to underreporting of the selling price" because an operator could report a selling price of zero, in which case the underreporting would result in "omitted property" contemplated by these provisions. However, Kinder Morgan's argument fails because in such a situation, the operator nevertheless would be required to file an annual statement for the leasehold (from which the assessor would calculate a value of zero), so the property would not, in fact, be "omitted from the assessment roll," see § 39-5-125(1).

20

taxpayer's property tax liability shall be determined based on the "actual value" of the taxable property. See Colo. Const. art. X, § 3(1).

¶40     For these reasons, we conclude that the statutory scheme governing property taxation of oil and gas leaseholds and lands authorizes the retroactive assessment of taxes when an operator has underreported the selling price of oil or gas.

### 3. Application

¶41     We conclude that the Montezuma County Assessor had the authority to issue the retroactive property tax assessments in this case. After the assessor initiated an audit of Kinder Morgan for the 2008 tax year, the auditor concluded that Kinder Morgan had claimed excess deductions in its annual statement, thereby underreporting the selling price of its $CO_2$. Based on Kinder Morgan's underreporting, the assessor undervalued the leaseholds by approximately $57 million, causing Kinder Morgan to be undertaxed by more than $2 million. We hold that, under these circumstances, the statutory scheme governing property taxation of oil and gas leaseholds and lands authorized the assessor to issue a corrective tax assessment in order to recover the amount by which Kinder Morgan had previously been undertaxed.

### B. Applicability of the Transportation Deduction

### 1. Standard of Review

¶42     We review decisions of the Board of Assessment Appeals under the Administrative Procedure Act, sections 24-4-101 to 24-4-108, C.R.S. (2016). § 39-8-108(2), C.R.S. (2016). Under the standards of review set forth in the Administrative Procedure Act, we will uphold the factual determinations of the Board of Assessment Appeals

unless they are "unsupported by substantial evidence when the record is considered as a whole." § 24-4-106(7). We review the Board of Assessment Appeals' interpretation and application of law de novo. Id.

## 2. Application

¶43 If an operator contracts with a "related party" to perform gathering, processing, or transportation services, then the operator is not entitled to deduct the full amount paid for those services in its netback calculation. 3 ARL 6.39–6.40. The Assessor's Reference Library defines "related parties" as:

> the individuals who are connected by blood or marriage; or partnerships; or businesses that are subsidiaries of the same parent company or are associated by one company controlling or holding ownership of the other company's stock or debt.

3 ARL 6.41 (emphasis added).

¶44 The Board of Assessment Appeals determined that Kinder Morgan and Cortez Pipeline Company were "related parties" because they were in a partnership relationship with one another, given Kinder Morgan's 50% ownership interest in the Cortez Pipeline Company partnership. This finding is supported by substantial evidence because in reaching its conclusion, the Board of Assessment Appeals relied on the auditor's testimony about her examination of Kinder Morgan's financial records and Cortez Pipeline Company's governing documents. Moreover, Kinder Morgan does not dispute the Board of Assessment Appeals' finding that Kinder Morgan owned 50% of Cortez Pipeline Company. Accordingly, the Board of Assessment Appeals did not err

in concluding that Kinder Morgan was not entitled to claim as a transportation deduction the full 22-cent tariff it paid to Cortez Pipeline Company.

¶45    We reject Kinder Morgan's argument that the Board of Assessment Appeals and court of appeals erroneously interpreted the term "related parties" because, according to Kinder Morgan, the term "partnerships"—without further elaboration—"is essentially meaningless." To the contrary, the Board of Assessment Appeals and the court of appeals appropriately interpreted the term "partnerships" according to its ordinary meaning in concluding that Kinder Morgan's 50% ownership interest in the Cortez Pipeline Company partnership made Kinder Morgan and Cortez Pipeline Company "related parties." We therefore conclude that the Board of Assessment Appeals and the court of appeals did not erroneously interpret the definition of "related parties" set forth in the Assessor's Reference Library.

## IV.  Conclusion

¶46    For the foregoing reasons, we conclude that the statutory scheme authorized the Montezuma County Assessor's tax assessment. We further conclude that the Board of Assessment Appeals did not err in concluding that Kinder Morgan had underreported the selling price because it was not entitled to deduct certain transportation costs. We therefore affirm the judgment of the court of appeals.